940 F.2d 1538
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
Jack FRIEDMAN, Barbara M. Barr, Plaintiffs-Appellees,
v.
James L. JENSEN, Jr., individually and in his official
capacity as Deputy Sheriff of the Adams County
Sheriff's Department, Defendant-Appellant,
and
Edward J. Camp, individually and in his official capacity as
Sheriff of the County of Adams, Timothy McGwire,
individually and in his official capacity as a Police
Officer on the Commerce City, Colorado Police Department,
Neal A. Wikstrom, individually and as Chief of the Commerce
City, Colorado Police Department, Defendants.
 No. 90-1319.
 United States Court of Appeals, Tenth Circuit.
 Aug. 9, 1991.
 
 Before STEPHEN H. ANDERSON, TACHA and BRORBY, Circuit Judges.
 ORDER AND JUDGMENT*
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 James L. Jensen, Jr., appeals from a denial of his motion for summary judgment, on qualified immunity grounds, seeking dismissal of plaintiffs' 42 U.S.C. Sec. 1983 action against him. The plaintiffs, Jack Friedman and his daughter, Barbara M. Barr, brought this action against Jensen, a deputy sheriff of Adams County, Colorado, and others, alleging that Jensen used excessive force against them, in violation of their constitutional rights, during the execution of a valid search warrant on the premises of plaintiffs' business, A & J Rentals, Inc., d/b/a/ Derby Pawn Loans.
 
 
 3
 The salient facts are as follows. On March 16, 1989, a Colorado state judge issued a search warrant for the following described property:
 
 
 4
 Business records regarding the daily transactions made by Jack Friedman and/or employees at Derby Pawns between December 8, 1988 and February 4, 1989, any numerical register of the pawning of property as described and required by C.R.S. 12-56-103 between the dates of December 8, 1988 and February 4, 1989, photographs of pawned personal property in the premises to record model numbers, serial numbers, and brand numbers of the pawned property; rent receipts, utility receipts, cancelled envelopes, city licenses, county licenses, state licenses and any other documents that tend to indicate the control and ownership of the property and premises.
 
 
 5
 Appendix to Defendant/Appellant's Brief, Tab B, Ex.A. The search warrant further stated: "YOU ARE HEREBY COMMANDED to search forthwith the place, person or vehicle above described for said property, and the said property and every part thereof to take, remove and seize, using such force as may reasonably be required in the performance of the acts and duties hereby commanded; ..." Id. The validity of the warrant is not in question in this case.
 
 
 6
 Pursuant to the warrant, on March 16, 1989, Deputy Jensen and other deputies from the Adams County Sheriff's Department, along with officers of the Commerce City Police Department, entered Mr. Friedman's business for the purposes outlined in the warrant, i.e., a seizure of business records, which records included pawn slips. The warrant would have permitted an immediate seizure of the pawn slips. However, alleging that he kept no copies of the pawn slips, Mr. Friedman requested permission to let his daughter hand copy information from the slips because he felt removal of such records would adversely impact his business. Jensen extended such permission and in fact allowed more than an hour for copying. Eventually, Jensen advised Mr. Friedman and Ms. Barr that he had given them as much time as he could to copy information from the daily pawn slips and reached over the counter to pick them up off the counter. At this point, Ms. Barr placed both of her hands on top of the pawn slips to stop him.
 
 
 7
 In her deposition Ms. Barr described the facts at that point as follows:
 
 
 8
 Q. He reaches for the pad--for the pile of papers that's in front of you?
 
 
 9
 A. Yes.
 
 
 10
 Q. Or off to your left a little?
 
 
 11
 A. Yes.
 
 
 12
 Q. And he picks up the papers?
 
 
 13
 A. Yes.
 
 
 14
 Q. And what do you do?
 
 
 15
 A. What are you doing?
 
 
 16
 Q. You turn and asked him what he's doing?
 
 
 17
 A. Yes.
 
 
 18
 Q. Do you take any physical movement to stop him from lifting up the papers?
 
 
 19
 A. I may. No, I don't known. I slap--put my hands--what are you doing? I may have gone, what are you doing?
 
 
 20
 Q. And placed your hand on top of the papers?
 
 
 21
 A. Yes.
 
 
 22
 Q. At which time he did what? Pulled the paper--
 
 
 23
 A. He pulled the paper out, but he must not have done it with his right hand because he hit me with his arm.
 
 
 24
 Q. He hit you with his arm?
 
 
 25
 A. He went across me. Not like that. He pushed me with his arm when he went to get the papers.
 
 
 26
 Q. So you're thinking he must have reached with his left hand?
 
 
 27
 A. He must have because I'm sitting on a stool.
 
 
 28
 Q. Okay. He picked up the papers?
 
 
 29
 A. He pulled the papers out from here.
 
 
 30
 Q. Out from under your hand?
 
 
 31
 A. Yes.
 
 
 32
 Q. And in doing so--
 
 
 33
 A. I was a little higher than this because he hit a little lower. It was there.
 
 
 34
 Q. So are we talking a strike here or are we talking that he bumped your body as he was pulling the papers away?
 
 
 35
 A. He bumped my body. He hit me. He didn't take a fist and slug me, no.
 
 
 36
 Q. It was in the motion of pulling the papers away from you his arm came into contact with your body?
 
 
 37
 A. Yes.
 
 
 38
 Appendix to Defendant/Appellant's Brief, Tab E(b) at 92-94 (emphasis added).
 
 
 39
 Mr. Friedman's deposition testimony described what happened next:
 
 
 40
 Q. All right. And what did you do?
 
 
 41
 A. Well, at that time I--I wanted to stop him there from grabbing. I said, let them finish the tickets. What do you want to do, put me out of business?
 
 
 42
 Q. And did you make a physical move at that point?
 
 
 43
 A. Well, I reached over towards him there to try to get ahold of his hands and before then at that particular point, he jabbed me in the chest and knocked me up against the wall.
 
 
 44
 Q. All right. When you say he jabbed you in the chest, that's with basically his left tricep and elbow?
 
 
 45
 A. His left elbow.
 
 
 46
 Q. Is that what struck you?
 
 
 47
 A. Yeah.
 
 
 48
 Q. And where do you recall it striking you?
 
 
 49
 A. Right in my chest right here because I was standing over like that to try to reach him, right underneath my arms, hit me right there.
 
 
 50
 Q. He is standing--you are standing to his left?
 
 
 51
 A. I was standing to his left; that's right.
 
 
 52
 Q. And you reached across to grab his hands?
 
 
 53
 A. To stop him; to stop him.
 
 
 54
 Q. All right. And it's at that point that he took his left arm--
 
 
 55
 A. He had his right arm to stop Barbara and took his left arm and hit me in the chest; that's right.
 
 
 56
 Q. Okay. And that movement was done with sufficient force to cause you to move backwards?
 
 
 57
 A. Yeah, hit this wall.
 
 
 58
 .............................................................
 
 
 59
 ...................
 
 
 60
 * * *
 
 
 61
 A. No, I couldn't lean on the wall. I would hit the wall solid. It's narrow. It was too narrow, you know. Three feet isn't very wide, you know, especially if we got a gun rack along there too.
 
 
 62
 Q. The gun rack makes it less?
 
 
 63
 A. I might have hit my back on the gun rack. I don't know.
 
 
 64
 Q. Okay. Can you describe the impact with the gun rack or the wall?
 
 
 65
 A. I don't know what to describe.
 
 
 66
 Q. What I'm asking is the force with which you hit it. I mean did you slam into it? Did the guns fall off the wall? Did you bump it?
 
 
 67
 A. I bumped it.
 
 
 68
 .............................................................
 
 
 69
 ...................
 
 
 70
 * * *
 
 
 71
 A. My--just above my hip, they hit the guns. They hit--this rack here. They hit the guns.
 
 
 72
 Q. Okay. And your back hit the wall above the guns?
 
 
 73
 A. Well, I can't recall whether my back hit the wall or whether the guns stopped me or--I was too--I was too upset by that time.
 
 
 74
 Q. Okay. When your body impacted with whatever it was, did you experience any pain?
 
 
 75
 A. No, no, not at that time.
 
 
 76
 Q. What did you do?
 
 
 77
 A. Well, my knees buckled a little bit and then I walked in to--called up Bob Gehler.
 
 
 78
 Appendix to Defendant/Appellant's Brief, Tab E(a) at 126-27, 129, 131 (emphasis added). Ms. Barr's description of Deputy Jensen's physical contact with Mr. Friedman is not significantly different from the account given by Mr. Friedman, although she indicates that he began to cry (apparently as much from anger and frustration as anything), and he rubbed his chest before going into his office to call his lawyer. Id., Tab E(b) at 96-100.
 
 
 79
 In their brief in the district court in opposition to Jensen's motion for summary judgment, Friedman and Barr do not allege any version of the physical contact in question in this case which is significantly different from that described above; and, the attachments to their brief consisted of the depositions from which the foregoing quotes were taken. In other words, plaintiffs' own testimony eliminates any genuine issue as to the material facts they allege as the basis of their complaint, excepting the ultimate material fact of reasonableness.
 
 
 80
 In its order denying the motion for summary judgment, the district court, addressing the qualified immunity issue, stated "that officers may not use unreasonable force. Therefore, Defendant Jensen's motion for summary judgment, to the extent it is based on the doctrine of qualified immunity, will be denied." Appendix of Defendant/Appellant, Tab G at 2. The court did not explain why the alleged use of force was unreasonable, or why a jury question arose on the facts alleged.
 
 
 81
 In Dixon v. Richer, 922 F.2d 1456 (10th Cir.1991), we discuss the analysis to be used in civil rights cases alleging excessive force under the Fourth Amendment. Although the complaint filed in this case did not specify a Fourth Amendment violation, the parties have subsequently treated the pleadings as having alleged a Fourth Amendment violation, so we do as well. In Dixon, we note that:
 
 
 82
 [I]n excessive force claims asserted under the Fourth Amendment, the qualified immunity question is usually answered in the Fourth Amendment inquiry. This is because, in the excessive force context, the Fourth Amendment inquiry asks directly whether the police officer reasonably could have believed that the force was necessary under the circumstances.
 
 
 83
 Id. at 1463 (footnote omitted). We also noted, however, the admonition in Graham v. Connor, 490 U.S. 386, 396 (1989), that--
 
 
 84
 The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.
 
 
 85
 Id. at 1462 (quoting Terry v. Ohio, 392 U.S. at 20-22 (1968)). Such inquiries are, of course, highly fact specific and generally confined to a case-by-case evaluation.
 
 
 86
 In this case, we hold that no reasonable jury could find that the Fourth Amendment was violated when Deputy Jensen "bumped" Ms. Barr while reaching to retrieve the pawn slips, which he had a lawful right to seize. "Not every push or shove," Graham v. Connor, 490 U.S. at 396, nor every incidental contact, in the course of lawful police business can give rise to a potential Fourth Amendment violation. Police work involves contact, and we refuse to countenance a rule of law that every time contact occurs, however slight, a jury may decide whether the contact was reasonable. Such a rule would paralyze law enforcement and be a virtual abdication of the court's duties to cut off litigation on motions for summary judgment in proper cases.
 
 
 87
 Mr. Friedman's claim presents a closer question. He is an individual more than 80 years of age, weighing approximately 175 pounds, according to his deposition testimony. Deputy Jensen struck him with an elbow with sufficient force to propel him backwards and cause his knees to buckle. But Mr. Friedman was able to proceed immediately into his office to telephone his attorney, and did not complain of injury or need medical assistance at the time. Moreover, Deputy Jensen did not follow-up the blow. There is only one contact in question here. It is significant that the contact took place after Mr. Friedman, according to his own admission, initiated the confrontation by moving toward Deputy Jensen and attempting to grab his hands. Keeping in mind the admonition of the Supreme Court that "police officers are often forced to make split second judgments--in circumstances that are tense, uncertain, and rapidly evolving," Graham v. Connor, 490 U.S. at 397, and that our "calculus of reasonableness" must embody an allowance for that fact, id. at 396, we also rule that Deputy Jensen did not violate the Fourth Amendment of the Constitution when he fended off Mr. Friedman with his elbow.
 
 
 88
 This is a case where police officers obviously made citizens very angry. But the officers had a lawful warrant which authorized them to seize the records in question, using whatever force was necessary at the time. We have no police beating here, no blows with fists, feet, or nightsticks, and no repeated "bumpings" or contact with elbow, or otherwise. Deputy Jensen touched each of the plaintiffs once, with each contact substantially contributed to by the respective plaintiffs. That is, Ms. Barr attempted to hold down the records which Deputy Jensen was authorized to seize, and Mr. Friedman tried to grab the deputy when he sought physically to seize the documents from Ms. Barr.
 
 
 89
 Accordingly, we REVERSE the district court's denial of Jensen's motion for summary judgment on qualified immunity grounds, and REMAND this case with directions that the district court grant Jensen's motion for summary judgment as outlined herein. The mandate shall issue forthwith.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3