**Willie DIXON, Hyon Dixon,**
**Plaintiffs–Appellees,**

v.

**Deputy Sheriff Donald RICHER, Deputy**
**Sheriff David Yarbrough,**
**Defendants–Appellants.**

No. 89–1336.

United States Court of Appeals,
Tenth Circuit.

Jan. 7, 1991.

Phillip A. Vaglica, (Ann A. Maenpaa, Asst. County Atty., Office of the County Atty. of El Paso County, Colo., with him on the briefs), Colorado Springs, Colo., for defendants-appellants.

Edward J. LaBarre, (Mark J. Rue, with him on the briefs), Colorado Springs, Colo., for plaintiffs-appellees.

Before ANDERSON, BALDOCK, and EBEL, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Sheriff's Deputies Donald Richer and David Yarbrough appeal a district court order denying their motion for summary judgment on qualified immunity and collateral estoppel grounds, in a 42 U.S.C. § 1983 action brought against them by Willie and Hyon Dixon. We affirm.

## I.

Willie and Hyon Dixon are married. On November 28, 1987, they went to the Oriental King Restaurant and Lounge (the Oriental King) in El Paso County, Colorado, with Hyon's brother, Kwan Choe, and a family friend, Pyonz Ober. While they were there, Choe became angry because Hyon Dixon danced with a man other than her husband. Choe threw a chair into some mirrors, causing damage. After be-

ing subdued, Choe left the restaurant with Ober.

The Dixons remained at the Oriental King long enough to discuss the resulting property damage with a security guard and the Oriental King's owner, both of whom the Dixons already knew. The Dixons assured them that Choe would pay for any property damage he had caused. The Dixons then left in their blue van.

The security guard had called the El Paso County's Sheriff's office when the disturbance took place. Shortly after the Dixons left, Sheriff Deputy Doris Flanigan arrived at the scene and questioned the security guard. Flanigan was informed that the "Korean male" (Choe) who had caused the damage had left, and that the people he had been sitting with were driving a blue van and had just left.

Assuming that Choe had left with the Dixons, Flanigan radioed to Deputy Richer, who had just pulled into the Oriental King's parking lot. She said "the blue van," and pointed in the direction the van had gone. Richer proceeded after the blue van in his police cruiser and stopped it a short distance from the Oriental King.

There is considerable dispute over what happened next. For purposes of reviewing the denial of summary judgment, we consider the evidence in the light most favorable to the non-moving party. As a result, the Dixons' account, as presented in affidavits, depositions and prior testimony, follows.

After pulling over, the Dixons both exited the van and began to walk back to Richer's car. Over the P.A. system, Richer told the Dixons to stop where they were. They complied. Richer then got out of his car, drew his handgun, and pointed it at the Dixons. Mr. Dixon informed Richer that he was a Department of Corrections Officer, and Richer lowered and reholstered his weapon. Mr. Dixon went back to the van to obtain his Department of Corrections identification, handed it to Richer, and asked "Now, could you kindly tell me why we are being stopped?" Instead of responding to Mr. Dixon's question, Richer

stated "I can care less who you work for. Get up against the van."

Mr. Dixon complied and put his hands up against the van. Richer then informed him to spread out from the van. Mr. Dixon moved his legs backward. At that point, Richer began to frisk him, and, while patting him down, told him to "move them back further." Mr. Dixon scooted his legs back even further. Richer then kicked Mr. Dixon in the instep, causing him intense pain. Dismayed, Mr. Dixon turned toward Richer and asked, "Is that f____ing necessary?" Richer said, "You stay right here," returned to his police car, and radioed for a backup.

Several minutes later, Deputy Yarbrough arrived. The two deputies conversed briefly and then walked over to the Dixons. As they did so, Richer again pulled his gun and told Mr. Dixon to get back up against the van, and Yarbrough had his nightstick out and tapped it menacingly in his hand. Mr. Dixon put his hands up against the van.

The officers began to pat him down again. Without warning, one of them kicked Mr. Dixon again, so forcefully that he started to fall. As Mr. Dixon fell, Richer hit him in the stomach with a metal flashlight. Once on the ground, the deputies got on top of him and began to beat and choke him.

At this point, Hyon Dixon became hysterical and screamed, "Don't hurt my husband. He didn't do anything wrong." She saw Yarbrough use his nightstick to twist her husband's leg. She screamed into Yarbrough's ear, and he pushed her to the ground, stepped on one of her legs, and twisted one arm and hand behind her back and up to her neck. Terrified, Mrs. Dixon resisted Yarbrough's attempts to handcuff her.

At this point, Flanigan arrived on the scene and assisted Yarbrough in handcuffing Mrs. Dixon. Mrs. Dixon screamed at Flanigan that Richer and Yarbrough had treated them like animals and that they had done nothing wrong. Flanigan assured Mrs. Dixon that if she had done nothing wrong, everything would be all right. Mrs.

Dixon calmed down and allowed herself to be handcuffed. Richer and Yarbrough then handcuffed Willie Dixon as well.

The Dixons were jailed and charged with "Second Degree Assault on a Police Officer," a felony, and various misdemeanors. They were tried by a jury in state court and acquitted of all charges. Subsequent to their acquittal, the Dixons filed this action against Richer and Yarbrough. Their § 1983 claim alleges that the deputies deprived them of various constitutional rights, including due process, equal protection, and the right to be free from unreasonable searches and seizures. The Dixons also asserted pendent state claims of libel, slander, assault, battery, false arrest, false imprisonment and malicious prosecution. At the close of discovery, Richer and Yarbrough moved for summary judgment. The district court dismissed any § 1983 claim grounded on the Eighth Amendment, but otherwise denied the motion for summary judgment.

## II.

■ Richer and Yarbrough assert that summary judgment should have been granted on the basis of collateral estoppel. They base their assertion on the fact that the Colorado court that conducted the Dixons' criminal trial ruled, in a pretrial suppression hearing, that Richer and Yarbrough had reasonable suspicion to stop and probable cause to arrest the Dixons.

■ "Under proper circumstances, federal courts accord preclusive effect to issues decided by state courts." *O'Connor v. City and County of Denver*, 894 F.2d 1210, 1225 (10th Cir.1990). In fact, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so...." *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) (citing to 28 U.S.C. § 1738). This practice "promote[s] the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Id.*

■ Colorado law precludes litigation of an issue if (1) the issue was actually litigated and necessarily adjudicated in a prior proceeding; (2) the party against whom preclusion is sought was a party to or was in privity with a party in the prior proceeding; (3) there was a final judgment on the merits in the prior proceeding; and (4) the party against whom preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding. *People v. Allee*, 740 P.2d 1, 5 (Colo.1987).

These requirements have not been met. First, the issues in this case were not decided in the prior proceeding. The first issue supposedly precluded, whether Richer and Yarbrough had reasonable suspicion to stop the Dixons, is not even in dispute. Even if the second issue—whether Richer and Yarbrough had probable cause to arrest the Dixons—were decided in the prior proceeding, it would not preclude litigation of the critical issue whether Richer and Yarbrough used unreasonably excessive force in arresting the Dixons.

Second, the Dixons did not have a full and fair opportunity in the prior proceeding to litigate the issue of probable cause to arrest. They did not have an opportunity to appeal the court's ruling on their motion to suppress. Before a final judgment, such an interlocutory appeal would have been improper, and after the judgment (the Dixons were acquitted), an appeal was rendered moot.

The district court correctly denied the motion for summary judgment on the basis of collateral estoppel.

## III.

■ Richer's and Yarbrough's chief argument on appeal is that the district court should have granted their motion for summary judgment on the basis of qualified immunity. "The doctrine of qualified immunity provides that government officials 'generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rozek v. Topolnicki*, 865 F.2d 1154, 1157 (10th Cir.

1989) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

■■ The framework for analyzing a claim of qualified immunity on summary judgment is as follows. "Once a defendant raises the defense of qualified immunity ... '[t]he plaintiff carries the burden of convincing the court that the law was clearly established.'" *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir.1989) (quoting *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988)). The plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred." *Id.* (quoting *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d at 646). The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Officials can "not reasonably be expected to anticipate subsequent legal developments ... [or] fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Powell v. Mikulecky*, 891 F.2d at 1456 (quoting *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738). If the plaintiff does not meet this initial burden, "the government official is properly spared the burden and expense of proceeding any further," *id.* at 1457, and should be granted summary judgment. On the other hand, if the plaintiff demonstrates to the court that the defendant's alleged conduct violated a clearly established right, then the "defendant assume[s] the normal burden of a movant for summary judgment of establishing that no material facts remain in dispute that would defeat her or his claim of qualified immunity." *Id.*

■ The claim of qualified immunity presents a question of law; "the court cannot avoid the question by framing it as a factual issue." *Pueblo Neighborhood Health Centers v. Losavio*, 847 F.2d at 646. Moreover, "[t]he court's decision should identify the law upon which it relied and state the basis for its conclusion." *Id.* We review *de novo* the district court's denial to determine whether it correctly applied these principles. *Osgood v. State Farm Mutual Auto Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988).

### IV.

■ Richer and Yarbrough assert their alleged conduct was improperly judged by a legal standard that was not clearly established at the time of the challenged incident.

After the incident, but before the district court denied defendants' motion for summary judgment, the Supreme Court issued its decision in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The *Graham* Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.*, 109 S.Ct. at 1871.

The Dixons' complaint bases its § 1983 claim on the alleged violation of various constitutional rights, including both the Fourteenth and the Fourth Amendment. However, their response to defendants' summary judgment motion focuses solely on the Fourth Amendment. R. Vol. I, Tab 4 at 9. The district court analyzed the Dixons' claim under the objective reasonableness standard of the Fourth Amendment.

Richer and Yarbrough argue that because *Graham* was decided after the challenged incident, it was not clearly established at the time of the incident that the Dixons' excessive force claim should be analyzed under the Fourth Amendment. They argue that at the time of the challenged incident the clearly established law in the Tenth Circuit was to analyze such allegations of excessive force under the Due Process Clause of the Fourteenth Amendment; therefore, in determining

qualified immunity, the district court should have applied a substantive due process analysis.[1] In support of this argument, they cite our recent decision in *Hannula v. City of Lakewood*, 907 F.2d 129 (10th Cir.1990).

Their argument misunderstands our pre-*Graham* approach to § 1983 claims alleging police use of unconstitutionally excessive force. Prior to *Graham*, we considered such claims under the Fourteenth Amendment when the plaintiff solely alleged "excessive force" instead of citing to a specific constitutional provision violated. *Trujillo v. Goodman*, 825 F.2d 1453, 1457 (10th Cir.1987) ("the constitutional provision on which most courts ... ground a § 1983 claim *solely alleging excessive use of force* by state officials is the Fourteenth Amendment") (quoting *Gumz v. Morrissette*, 772 F.2d 1395, 1399 (7th Cir.1985), *cert. denied*, 475 U.S. 1123, 106 S.Ct. 1644, 90 L.Ed.2d 189 (1986)) (emphasis added); *Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1378 (10th Cir.) (when the plaintiff did not articulate a specific constitutional provision violated by excessive use of force, the court applied substantive due process analysis), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

We did not, however, "exclude[] other grounds for relief." *Trujillo v. Goodman*, 825 F.2d at 1457 (applying due process analysis since it was the only claim the plaintiff pressed on appeal); *McKay v. Hammock*, 730 F.2d 1367, 1373 (10th Cir. 1984) (en banc) (stating the relevant inquiry should focus on the particular constitutional provision at issue). Indeed, nothing in the law of this circuit barred a plaintiff from specifically alleging infringement of her Fourth Amendment right to be free from unreasonable searches and seizures.

Nor does *Hannula v. City of Lakewood* support such a bar. In *Hannula*, we stated the proposition that prior to *Graham* we "generally examined claims of excessive use of force under a substantive due process standard." 907 F.2d at 131. But in neither *Hannula* nor the cases we cited in *Hannula* for that proposition (*Trujillo* and *Hewitt*, cited above) did the plaintiff plead and pursue the specific allegation that her Fourth Amendment rights had been violated. Confronted with a general claim of excessive force that predated the Supreme Court's clarification in *Graham*, we held in *Hannula* that the circuit's established law required a substantive due process analysis.

In this case, however, while the incident occurred before *Graham*, the Dixons did not solely allege "excessive force" or violation of substantive due process. In fact, in their response to Richer's and Yarbrough's motion for summary judgment on the basis of qualified immunity, the Dixons specifically argued that they had been illegally searched and seized, in violation of the Fourth Amendment.

Our holding in *Hannula* would govern this case if a well-established and well-defined body of Fourth Amendment law did not predate *Graham*, i.e., if, at the time deputies Richer and Yarbrough stopped the Dixons, there was no clearly established set of rules and norms governing the propriety, under the Fourth Amendment, of stopping, searching, and seizing private citizens. Obviously, such was not the case. Long before *Graham*, the Supreme Court set forth the salient standard for governing the situation that developed that night in Colorado: law enforcement officers must be "objectively reasonable" in their searches and seizures. *See Terry v. Ohio*, 392 U.S. 1, 20–27, 88 S.Ct. 1868, 1879–83, 20 L.Ed.2d 889 (1968) (investigative stop); *Tennessee v. Garner*, 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (§ 1983 action for excessive force evaluated under the Fourth Amendment: "reasonableness depends on not only when a seizure is made, but also how it is carried out"). That *Graham* directed lower courts to apply Fourth Amendment analysis to

---

**1.** The substantive due process approach considers the following factors:
   1) the relationship between the amount of force used and the need presented;

2) the extent of the injury inflicted; and
   3) the motives of the state officer.
*See Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1379 (10th Cir.1985).

§ 1983 claims of excessive force during arrest is not evidence that such claims were previously foreclosed.

Since the plaintiffs pled and pursued their claim under the Fourth Amendment, the district court properly applied the Fourth Amendment's "objective reasonableness" standard to the officers' alleged conduct. That standard was clearly established at the time the challenged incident took place.

## V.

■ Richer and Yarbrough next assert that, even if the Fourth Amendment standard was clearly established, the district court should have held that their alleged conduct was objectively reasonable under the Fourth Amendment.

The relevant inquiry is summarized in *Graham:*

> Determining whether force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. *Tennessee v. Garner*, 471 U.S. 1, 8 [105 S.Ct. 1694, 1699, 85 L.Ed.2d 1] (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 [103 S.Ct. 2637, 2642, 77 L.Ed.2d 110] (1983)). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *See Terry v. Ohio*, 392 U.S. 1, 22–27 [88 S.Ct. 1868, 1880–83, 20 L.Ed.2d 889] (1968). Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 [99 S.Ct. 1861, 1884, 60 L.Ed.2d 447] (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *See Tennessee v. Garner*, 471 U.S. at 8–9 [105 S.Ct. at 1700] (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Terry v. Ohio*, 392 U.S. at 20–22 [88 S.Ct. at 1879–80].

> \*    \*    \*    \*    \*    \*

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham v. Connor*, 109 S.Ct. at 1871–72 (citations altered for clarification). In applying this standard, we are to consider the evidence in the light most favorable to the Dixons.

Although Richer had a reasonable basis for stopping the Dixons, they were not suspected of committing any crime. The investigative stop was justified to ascertain whether the Dixons could provide information concerning the whereabouts of Kwan Choe (who himself was only guilty of a misdemeanor). Yet neither Richer nor Yarbrough asked the Dixons about Choe. When Willie Dixon identified himself, and asked why they had been stopped, Richer refused to inform him of the reason he was being detained.

Willie Dixon did not resist being frisked. Showing due deference to Richer's judgment in an uncertain, and potentially dangerous circumstance, it is certainly possible that what Dixon perceived as a malicious kick was actually a reasonable act designed to position Dixon's legs for a pat down. Moreover, Dixon's response to being kicked the first time (turning around and swearing at Richer) could reasonably have been interpreted as an act of resistance. Richer's initial response, calling for a backup (Yar-

brough), was both reasonable and prudent. But when Willie Dixon was kicked (the second time), struck with a flashlight, and then choked and beaten, he had already been frisked, had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats. While it is reasonable to frisk a detainee suspected of carrying a weapon, *Terry v. Ohio*, 392 U.S. at 24, 88 S.Ct. at 1881, it is not reasonable to hit him in the stomach with a flashlight, or choke and beat him, solely on the basis of that suspicion.

As for resisting arrest, it bears reminding that the Dixons were not under arrest. They were ostensibly stopped in order to be asked some questions. That Willie Dixon resisted being choked and beaten does not retroactively justify it. Neither does Hyon Dixon's resistance retroactively justify the alleged treatment of her or her husband.

For purposes of summary judgment, viewing the totality of the circumstances judged solely under the Dixons' version of the facts, we agree with the district court that the alleged conduct is not objectively reasonable under the Fourth Amendment.

### VI.

Under the qualified immunity inquiry, we must next determine whether a reasonable officer could have believed that the conduct in question did not violate clearly established law. In general, even though conduct is "unreasonable" under the Fourth Amendment, because of "the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment," *Anderson v. Creighton*, 483 U.S. 635, 644, 107 S.Ct. 3034, 3041, 97 L.Ed.2d 523 (1987), such conduct may nevertheless be objectively reasonable for purposes of qualified immunity.[2] In insufficient warrant claims, for example, the Fourth Amendment inquiry asks whether probable cause existed for the magistrate to issue the warrant. But even if a court decides that there was no probable cause, in a close case it may have been objectively reasonable for a police officer to rely on the judgment of the magistrate and believe that probable cause existed. *See Malley v. Briggs*, 475 U.S. 335, 345–46, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986).

However, in excessive force claims asserted under the Fourth Amendment, the qualified immunity question is usually answered in the Fourth Amendment inquiry.[3] This is because, in the excessive force context, the Fourth Amendment inquiry asks directly whether the police officer reasonably could have believed that the force was necessary under the circumstances.[4] Since we have already held that, under the Dixons' version of the facts, a reasonable police officer would not have believed that the force used was necessary under the circumstances, the qualified immunity question has already been answered on the state of the record before us.

We hold that the district court was correct in denying summary judgment on grounds of qualified immunity. That, of course, does not mean that the officers cannot reassert their qualified immunity claims at and after trial when the factual disputes have been resolved. At this juncture, however, material facts remain in dispute,[5] and the deputies are not entitled to summary judgment on the basis of qualified immunity.

### VII.

This still does not end our inquiry. The district court identified the Fourth Amend-

---

2. This is but another way of phrasing the requirement that the right the official is alleged to have violated was clearly established at a meaningful level of specificity. *See Anderson v. Creighton*, 483 U.S. at 639–40, 107 S.Ct. at 3038–39.

3. *See* Urbonya, *Problematic Standards of Reasonableness: Qualified Immunity in Section 1983 Actions for a Police Officer's Use of Excessive Force*, 62 Temp.L.Rev. 61, 97–114 (1989).

4. This is not a circumstance where the officer is relying on the probable cause determination of a magistrate. The police officer is the sole actor whose objective reasonableness is at issue.

5. Richer and Yarbrough vigorously dispute the Dixons' version of the stop and ensuing altercation, and submit affidavits directly contradicting the Dixons' account.

ment and its objective reasonableness test as the relevant legal standard in the disposition of the motion for summary judgment. But the district court failed to follow our directive in *Pueblo Neighborhood Health Centers v. Losavio,* 847 F.2d at 646, and "state the basis for its conclusion" that, under the evidence presented by the Dixons, Richer's and Yarbrough's seizure was objectively unreasonable. R. Vol. I, Tab 5 at 7.

However, remanding this case to the district court in order for it to set out the same analysis that we have just presented would not affect the outcome of the district court's decision, and would waste judicial resources. This court is "free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *Griess v. Colorado,* 841 F.2d 1042, 1047 (10th Cir.1988) (quoting *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987)). For the reasons stated above, we agree that a police officer could not have reasonably engaged in the conduct that the Dixons describe without violating the Fourth Amendment, and that an officer could not reasonably believe that such conduct did not clearly violate the Fourth Amendment.

Accordingly, we AFFIRM the decision of the district court.