**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 17 2005**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

GARY GOUSKOS,

Plaintiff-Appellant,

v.

JOSEPH D. GRIFFITH,

Defendant-Appellee.

No. 03-5133
(D.C. No. 01-CV-967-H)
(N.D. Okla.)

---

ORDER AND JUDGMENT  *

---

Before **ANDERSON** and **BALDOCK** , Circuit Judges, and  **MARTEN** ,** District Judge.

---

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

---

\*    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

\*\*    The Honorable J. Thomas Marten, District Judge, United States District Court for the District of Kansas, sitting by designation.

Gary Gouskos appeals from summary judgment granted in favor of defendant Joseph Griffith on his claims for false arrest and excessive force brought under 42 U.S.C. § 1983 and under the Oklahoma Constitution and state law. Our jurisdiction arises under 28 U.S.C. § 1291. Because we conclude that there are genuine issues of material fact precluding summary judgment on both claims and that the district court erred in applying issue preclusion to bar the false-arrest claim, we reverse and remand.

## I. Standard of review

Our standard of review in cases in which summary judgment has been granted on the basis of issue preclusion is well settled.

> We review the grant of summary judgment de novo, applying the same standards as did the district court under Fed. R. Civ. P. 56(c). The movant has the burden of establishing that it is entitled to summary judgment, and we examine the record in the light most favorable to the nonmoving party. Additionally, the legal question of whether issue preclusion bars the relitigation of the issue of probable cause in a subsequent action is reviewed de novo.

*Bell v. Dillard Dep't Stores, Inc.*, 85 F.3d 1451, 1453-54 (10th Cir. 1996) (quotations and citations omitted).

> Similarly,

> [w]e review a grant of summary judgment on the basis of qualified immunity de novo. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and one party is entitled to judgment as a

matter of law.  Fed.R.Civ.P. 56(c).  We construe the record in the
light most favorable to the non-moving party.

*Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004).

## II.  Relevant facts and proceedings below

The following facts are contained in the summary judgment record.

**A.  The altercation and preceding events.**        On January 1, 2000, Gouskos received a call from his eighteen-year-old daughter just after midnight, asking him to pick her up from a New Year's Eve party that had gotten out of hand.  Don Bahnmaier, a city council member, lived next door to the house where the party was being held, and had called the Glenpool city police.  Bahnmaier stood outside and watched as the police handled the situation.  City police, including Officer Robert McAtee, were already at the house by the time defendant State Trooper Joseph Griffith–who is now the only defendant left in the litigation–arrived at the scene.

The police decided to break up the party and to require the party-goers, some of whom were already eighteen or older, to have their parents pick them up. It was undisputed that the officers' intent was "to get the kids out of there and preferably to their parents."  Aplt. App., Vol. II at 482 (Officer McAtee's deposition testimony).  Accordingly, even though the party-goers refused to let the police into the house, no arrests were made that evening, other than of

Gouskos. Gouskos retrieved his daughter from the house without incident, with McAtee and Griffith both knowing why he was there. *Id.* Vol. I at 345.

When another parent asked for Gouskos's help in getting her daughter, Gouskos returned to the house. As Gouskos walked from the back to the front yard of the house with the other parent and her daughter and another girl, and a couple of young men and a young woman who had asked Gouskos for a ride home, McAtee approached Gouskos. McAtee was standing between Gouskos and the street, where Gouskos's wife was waiting in their car.

It is at this point that Gouskos's and the other eyewitness testimony differs markedly from McAtee's and Griffith's testimony, and the material facts are hotly disputed. Accepting Gouskos's version of the events for summary judgment purposes, McAtee told Gouskos that he could not take the young adults home, so Gouskos turned to tell them they could not go with him. McAtee then stepped closer and told Gouskos he was "interfering with an arrest and [had] no right to be here." *Id.* Vol. II at 454. Gouskos replied, "I have as much right to be here as you do." *Id.* Gouskos testified that, at that point, someone "attacked [him] from behind," and that as he lost his balance and fell to the ground, he grabbed at whoever attacked him. *Id*. at 454-55. It is undisputed that Griffith was the attacker.

-4-

Gouskos admitted that he struggled after that point, but only "to try to keep from being slammed on my face." *Id.*, Vol. I at 180. When asked whether he tried to prevent his hands from being cuffed, he responded, "I was face down on the ground just struggling, I would say yes." *Id.* When asked whether he tried "to bring [his] hands between [his] body and the ground?," he stated, "I don't think so, no." *Id.* at 180-81.

At the preliminary hearing in 2000, Rocky Cargola, one of the eighteen-year-olds who asked Gouskos for a ride home, and who was with him during the altercation and "saw everything clearly," testified that McAtee approached Gouskos and told him that he could not take Cargola home. *Id.* at 557, 554. Cargola testified that no one warned Gouskos that he was going to be arrested or that he was interfering, and that Gouskos did not strike McAtee. *Id.* at 554. He testified that Gouskos was just "[t]ackled from the back" by Griffith. *Id.* at 555.

At her deposition taken in January 2003, Chandler Ishmael, the young woman who had asked Gouskos for a ride home, testified that two officers approached Gouskos and asked him what he was doing. When Gouskos replied that he was taking the young adults home, an officer replied, "No you're not," and Gouskos said, "Yes, I am" and "took a step forward to get around them, and then

the officers grabbed him and threw him to the ground on his face and put his hands behind his back." *Id.*, Vol. I at 210-11.

Bahnmaier testified in his July 2000 sworn statement that he saw Gouskos come around the house with some boys and saw Glenpool officers go up to talk with him, but that he did not notice anything "out of the ordinary" happen during that discussion. *Id.*, Vol. II at 566. He testified that he turned away for a moment but turned back around when he heard a scuffle, just in time to see the Glenpool officers and Griffith throw Gouskos to the ground:

> [T]he whole time they were throwing Mr. Gouskos down to the ground, he was saying, "Why are you doing this? I'm not fighting you. I'm not fighting you." . . . They threw him down, the two Glenpool police officers handcuffed him. And the highway patrolman had him around his neck and was choking him so hard his face had lost all color, and he was obviously under–in duress, begging for this highway patrolman that he's not–"I'm not fighting you. Please, you're choking me." And my wife hit me and said, "They're going to kill him." Because at that time, I thought they were.
> . . . .
>
> [T]he highway patrolman rolled [Gouskos] over on his stomach and took his foot and put it right in the middle of his back and started pushing down on his back. Mr. Gouskos says, "Officer, please get your foot out of my back. I can't breathe." And the highway patrolman said, "Too bad," and pushed even harder.
>
> Now, I'm on the city council, and I'm sitting here watching this. In fact, that's when I said, "This is enough," and I called out to . . . McAtee . . . [a]nd I said, "This is B-S. This guy is not resisting you. Why are you doing this to him?" And Robert McAtee said–told

-6-

me to shut up and said, "Do you know the law?" And I said, "no." And then, he said, "Then I would advise you to shut up."

Aplt. App., Vol. II at 568-69.

Bahnmaier testified that he then went to another Glenpool policeman and asked him why they were treating Gouskos that way, and the officer told him to go home in a threatening manner that caused Bahnmaier to believe that, if he didn't, he "would be next." *Id.* at 569. Bahnmaier testified as a council member that the city had five or six lawsuits against them from "people claiming that our cops are roughing them up, that our cops are being mean to them," and that he saw Griffith "rough" up Gouskos and the Glenpool police did nothing to stop him. *Id.* at 569-70. He testified that Griffith then "grabbed [Gouskos] by the back of his shirt and back of his pants . . . opened the door and threw him in the [patrol] car headfirst." *Id.* at 570. He testified that, when Gouskos's wife respectfully asked Griffith what he was going to do with her husband and what her husband had done wrong, "he told her to shut up or she was next." *Id.* at 571. Bahnmaier stated that he "never heard any orders issued to [Gouskos] that he refused to obey" before Griffith tackled Gouskos. *Id.* at 577. He stated that it was possible that the officers told Gouskos to do something that Bahnmaier did not hear, but that he

> was close enough, I could hear them when they had their foot and [Griffith] was grinding his foot in the middle of his back. I was close enough to hear [Gouskos] say, "Please, I can't breathe" . . . [in

-7-

a] very low [voice] because he couldn't breathe, and I heard that very clearly. So I'm assuming that if they had issued any orders to him or whatever, I would have heard that, as well. . . . I thought they were going to kill him. My wife did, too.

*Id.* at 577-78. Bahnmaier's preliminary hearing testimony was consistent with his sworn statement quoted above. *See id.* at 543-47.

The officers' preliminary hearing testimony is not present in the record on appeal. A police report prepared by Glenpool officer Randy Rains two days after the incident and submitted in the summary judgment materials did not allege that Gouskos assaulted McAtee before he was arrested or that McAtee ever told Gouskos he was under arrest. Rains stated that, after McAtee told Gouskos he could not take the boys home, Gouskos stated "that they were leaving with him. McAtee again told him they were not. After that I saw arms flying and McAtee and Trooper Doug Griffith taking Gouskos to the ground." *Id.*, Vol. I at 223.

Griffith submitted excerpts from McAtee's and Griffith's deposition testimony taken three years after the arrest. McAtee testified that he instructed "two juveniles," a young man and a young woman, [1] that they could not leave without their parents and to go stand by a patrol car. *Id.* at 331. He did not indicate that the young adults refused to follow his instruction, and nothing in the record indicates that Gouskos was physically holding or touching the young

---

[1] Cargola was already eighteen and no longer a "juvenile." The record does not reveal how old Ishmael was.

adults. McAtee testified that, after he told Gouskos he could not leave with the two young adults, Gouskos said "he was leaving with them, I was to get out of his way." *Id.* at 332. He testified that Gouskos then bumped him with his torso in an "attempt" to push him out of the way, and that McAtee warned him that "he would be arrested for interfering with police officers if he didn't [desist] and leave." *Id.* at 332-33. He stated that Gouskos then bumped him with his stomach, and that is when he told Gouskos he was under arrest. *Id.* at 334-35. But McAtee's testimony differs from Griffith's, who testified that Gouskos chest-butted, and then used his forearm to push, Officer McAtee, at which point McAtee "yelled that he's under arrest." *Id.* at 347. He claims he then also "told [Gouskos] he was under arrest for assaulting an officer . . . and we took him to the ground." *Id.*

**B. Gouskos's criminal prosecution**. A month later, Gouskos was charged by information with one felony count of assault on a police officer, and one count each of obstructing an officer, resisting an officer, and malicious injury to property (Griffith's helmet strap was broken during the altercation). He was arraigned a month later, but his preliminary hearing was not held until August 23, 2000.

In his summary judgment materials, Griffith submitted a single page of transcript from Mr. Gouskos's preliminary hearing, in which the state magistrate judge stated:

> The question is whether or not there was a crime committed. *And the law is that, at the level of a preliminary hearing, if there is an issue of fact, the Court has to resolve it in favor of the State, and that's what the Court does* .
>
> I find that the State has proved assault and battery on a police officer, two counts, and that there is probable cause to believe that this defendant committed that crime.

Aplt. App., Vol. I at 362 (emphasis added). On August 28, Gouskos was charged with a second count of felony assault and battery on an officer. On February 2, 2001, the whole case and all counts were dismissed, with costs assessed to the State.

**C. Federal proceedings.** Gouskos filed his complaint in December 2001. After extensive discovery, Griffith moved for summary judgment in March 2003 on the false arrest claims on the basis of issue preclusion and qualified immunity and for summary judgment on the excessive force claims on the basis of qualified immunity. The district court granted judgment in favor of Griffith, and Gouskos appeals.

## III.  Analysis

### A.  False arrest claim

The common-law tort of false arrest has a single element in Oklahoma: that the defendant-officer arrested the plaintiff without probable cause. *Overall v. State ex rel. Dep't of Pub. Safety*, 910 P.2d 1087, 1091 (Okla. Ct. App. 1995). Griffith argued, and the district court agreed, that Gouskos's false-arrest claim was precluded by the state magistrate judge's preliminary-hearing determination that sufficient evidence warranted binding Gouskos over for trial on the issue whether Gouskos had, indeed, committed two counts of assault on an officer. In his summary judgment response and on appeal, Gouskos submitted the evidence outlined above to support his claims that both McAtee and Griffith lied about Gouskos touching McAtee, and that no one ever told him he was under arrest before Griffith attacked him. Gouskos claimed that he should be given an opportunity to prove that Griffith's attack and seizure was a false arrest made without probable cause.

"We apply Oklahoma state law to determine the preclusive effect, if any, of the [state] proceedings on this federal court action." *Pittsburg County Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 708 (10th Cir.), *cert. denied*, 125 S. Ct. 44 (2004). In Oklahoma, "once a court has decided an issue of

fact or of law necessary to its judgment, the same parties or their privies may not relitigate that issue in a suit brought upon a different claim." *Miller v. Miller*, 956 P.2d 887, 897 (Okla. 1998). The party seeking to apply preclusion "must show that the issue sought to be precluded was actually litigated and determined in the prior action between the parties or their privies, and that the determination was essential to the decision in the prior action." *Id.* But "[i]ssue preclusion is not applied mechanistically. It may only be invoked if the party against whom the earlier decision is interposed had a 'full and fair opportunity' to litigate the critical issue in the previous case." *Id.* at 898.

Gouskos argues that issue preclusion should not apply because he never had a full and fair opportunity to litigate the issue of probable cause and because there is evidence to show that the magistrate court's probable-cause ruling was erroneous. We agree.

We first note that preliminary hearings are not true trials in that the court does not resolve disputed facts regarding probable cause that are intertwined with the guilt or innocence of the accused–that is for the jury to decide. *See State v. Tinkler*, 815 P.2d 190, 192 (Okla. Crim. App. 1991), *overruled on other grounds by State v. Johnson*, 877 P.2d 1136 (Okla. Crim. App. 1992). Instead, the magistrate judge simply determines whether there is evidence, if believed by a jury, that could result in a finding that a defendant committed a crime.

Although their early opinions did not use the terms "issue preclusion" or "collateral estoppel," Oklahoma courts have long held that a finding of probable cause made at a preliminary hearing in a criminal case provides prima facie defensive evidence in subsequent civil case that a false-arrest claim should be dismissed. *See, e.g., Ames v. Strain*, 301 P.2d 641, 644 (Okla. 1956); *Lindsey v. Couch*, 98 P. 973, 976 (Okla. 1908) ("Where the grand jury have returned a true bill upon the charge made, such finding amounts to a judicial recognition that probable cause does exist. Hence arises a rule that a plaintiff, suing for damages in such a case, must prove the absence of probable cause; and, if he fails to do so, such judicial recognition is prima facie proof of a probable cause.") (quotation omitted). If the facts underlying the arrest are undisputed, the prima facie evidence becomes conclusive on the issue, and the court must dismiss the false-arrest claim. *See Ames*, 301 P.2d at 644; *cf. Young v. First State Bank, Watonga*, 628 P.2d 707, 710-11 (Okla. 1981) ("If there is no controversy over the facts, or if the facts are conceded, then it becomes a pure question of law for the court to determine whether there was probable cause or not. It therefore becomes the duty of the court, when evidence has been given to prove or disprove the existence of probable cause, to submit to the jury its credibility, and what fact it proves, with instruction that the facts found amount to proof of probable cause, or that they do not.") (quotation omitted).

There are several more recent Oklahoma cases in which these principles are applied. For example, in *Delong v. State ex rel. Oklahoma Department of Public Safety*, 956 P.2d 937 (Okla. Ct. App. 1998), the Oklahoma Court of Appeals noted that the false-arrest plaintiff had pleaded *nolo contendere* in her criminal case. *Id.* at 939. The arresting officer's affidavit stated that he observed the plaintiff weaving on and off the road, and the plaintiff "offered no evidence concerning the operation of her vehicle contradicting the arresting officer's affidavit," thus establishing the arresting officer's probable cause to initially stop and arrest the plaintiff. *Id.* Together, these facts were fatal to the claim of false arrest. *Id.*

Likewise, if the false-arrest plaintiff is convicted in the criminal trial for the acts for which he was arrested, probable cause for his arrest is conclusively established and precludes a subsequent civil action for false arrest. *See Franklin v. Thompson*, 981 F.2d 1168, 1171 (10th Cir. 1992) (applying issue preclusion in Oklahoma case to bar false-arrest claim because plaintiff had been convicted of the disorderly conduct that formed the basis of probable cause for her arrest, and she did not appeal from that conviction). But here, there was never a final determination regarding probable cause because the State dismissed the criminal case, and the underlying factual predicate for probable cause is disputed. Thus we turn to those cases that are factually similar to the case at bar.

-14-

The Oklahoma Supreme Court recognized many years ago that a plaintiff may establish want of probable cause, notwithstanding having been bound over for trial after a preliminary hearing, by showing that false testimony was the basis for a probable cause ruling. *See Ames*, 301 P.2d at 643-44 (recognizing that question of probable cause resolved by magistrate at preliminary hearing precludes civil prosecution for false arrest except when the arresting officer "is shown to have presented the facts to the justice dishonestly, or to have . . . acted without probable cause") (quotation omitted); *Young*, 628 P.2d at 710-11. "Because the doctrine of issue preclusion is flexibly applied [in Oklahoma], the focus is on whether its application would work an injustice on the party against whom estoppel is urged." *Carris v. John R. Thomas & Assocs.*, 896 P.2d 522, 529 (Okla. 1995).

In a more recent malicious prosecution case [2] against a defendant who swore a criminal complaint accusing the plaintiffs of committing a crime, the Oklahoma Supreme Court held that, "where the evidence is conflicting on the question of the existence of probable cause, the court should submit the issue to the jury" *even though* "a judge found that probable cause existed to detain" the plaintiffs and

---

[2] Malicious prosecution cases are analogous to false-arrest cases because the plaintiffs in both situations must prove the essential element of lack of probable cause. *See Page v. Rose*, 546 P.2d 617, 620 (Okla. 1975).

had bound them over for trial. *Powell v. LeForce*, 848 P.2d 17, 18-19 (Okla. 1992).

*Danner v. Dillard Department Stores, Inc.*, 949 P.2d 680 (Okla. 1997), provides one of the more recent Oklahoma Supreme Court discussions of how to apply probable-cause issue preclusion in a false arrest/malicious prosecution case. *Danner* first set forth the general rule of issue preclusion as stated in *Adamson v. Dayton Hudson Corp.*, 774 P.2d 478, 479 (Okla. Ct. App. 1989), and *Christopher v. Circle K Convenience Stores, Inc.*, 937 P.2d 77, 79 (Okla. 1997)–which were both cited by the district court in this case as the controlling precedent: "an order at preliminary hearing binding over the defendant for criminal trial precludes relitigation of the issue of probable cause in a subsequent civil suit for false arrest following acquittal." 949 P.2d at 682 (quotation omitted). But the *Danner* opinion next expounded on the "important exception" to that rule: issue preclusion does not apply if a party did not have a full and fair opportunity to litigate an issue. *Id.* Because the plaintiffs in *Danner* had shown in their criminal trial that false testimony supported the probable cause determination, the court held that the "false testimony should not provide the basis for both a determination of probable cause for an arrest and preclusion of relitigation of that issue in a civil suit." *Id*. at 683.

In the cases cited by the district court or by Griffith where issue preclusion barred the civil suit, either the facts supporting the probable cause determination were undisputed or the false arrest/malicious prosecution plaintiff did not earlier challenge the probable cause determination. *See, e.g., Christopher*, 937 P.2d at 80 (affirming summary judgment based on issue preclusion in case in which there were "no disputed facts" on probable cause issue, and distinguishing *Bell* because there were "many disputed factual contentions" in that case); *Adamson*, 774 P.2d at 479 ("Plaintiff did not dispute that probable cause existed in order to bind her over for trial . . . ."); *Hubbert v. City of Moore*, 923 F.2d 769, 771, 773 (10th Cir. 1991) (relying on *Adamson* and *Lee* and noting undisputed facts that false-arrest plaintiff had run in officers' direction "with a knife in her hand" although she was later acquitted of assault with a dangerous weapon).

We conclude that this case falls into the exception for applying issue preclusion. Here, as in *Powell*, there has been no final ruling on the issue of whether Griffith presented false testimony to obtain a probable cause finding. As noted above, the state magistrate judge did not decide the credibility issues between Gouskos's witnesses' and Griffith's versions of the pre-arrest events; the judge simply resolved the probable-cause dispute in favor of the State as required by law. Therefore, no factfinder has ever finally resolved the question whether

-17-

Griffith in fact had a reasonable belief that Gouskos was assaulting McAtee or was attempting to arrest Gouskos before Griffith tackled and seized him.

Further, Oklahoma has adopted the RESTATEMENT (SECOND) OF JUDGMENTS § 28(5), which provides that, even when an issue is actually litigated and determined, relitigation of the issue in a subsequent action is not precluded if there is a clear and convincing need for a new determination "because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity . . . to obtain a full and fair adjudication in the initial action." *Salazar v. City of Okla. City*, 976 P.2d 1056, 1061 n.7 (Okla. 1999) (quotation omitted). Oklahoma also follows the RESTATEMENT (SECOND) OF JUDGMENTS § 29. *See Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1272 n.3 (10th Cir. 1995); *and see Kirkpatrick v. Chrysler Corp.*, 920 P.2d 122, 132 (Okla. 1996) (citing § 29 as the law concerning issue preclusion in subsequent litigation with non-parties). Section 29 provides that a party precluded from relitigating an issue with an opposing party, in accordance with § 28 of the RESTATEMENT, is also precluded from doing so with another person *unless* other circumstances justify affording him an opportunity to relitigate the issue. These circumstances include when "[t]he forum in the second action affords the party against whom preclusion is asserted procedural opportunities in the presentation and determination of the issue that were not

-18-

available in the first action and could likely result in the issue being differently determined." RESTATEMENT (SECOND) OF JUDGMENTS § 29(2). McAtee's and Griffith's testimony was contested, but the preliminary hearing gave no opportunity for Gouskos to obtain a ruling on their credibility. When the State dismissed the criminal charges, Gouskos lost his opportunity to obtain a final ruling on whether he chest-bumped McAtee, which was act that Griffith claimed gave him probable cause to seize Gouskos. Gouskos has never had an opportunity to obtain a full and fair adjudication on the credibility issues underlying the probable cause determination, and he must be allowed his day in court.

Thus, under these circumstances, we conclude that Oklahoma would not give preclusive effect to the probable-cause determination. *See, e.g.*, *Danner*, 949 P.2d at 683 (refusing to apply issue preclusion in malicious prosecution case in which plaintiff claimed that complainant in criminal case perjured her testimony); *Powell*, 848 P.2d at 18-20 (holding that issue of probable cause in malicious prosecution case should have gone to the jury because of contested facts, even though judge in criminal case had made probable cause finding); *cf. Lindsey*, 98 P. at 975-76 (holding that finding of no probable cause by magistrate and subsequent finding of probable cause by grand jury neutralized each other so that plaintiff in malicious prosecution case had to produce other evidence in order to prove want of probable cause).

We further note that, although Gouskos bears the burden of proving a lack of probable cause, *cf. Lewis v. Crystal Gas Co.*, 532 P.2d 431, 433 (Okla. 1975) (malicious prosecution case), Griffith bore the burden of establishing the defense of issue preclusion on the issue of probable cause, *see Salazar*, 976 P.2d at 1060. Thus, Griffith bore "the burden of establishing that the issue [of probable cause] was actually litigated and determined in the prior action between the parties or their privies, and that its resolution was essential to a decision in that action." *Id.* at 1060-61. When a false-arrest defendant desires to use facts from a previous suit prosecuted in a different court system for issue preclusion, Oklahoma law requires the defendant to submit a complete record of the previous case, including *all* the preliminary hearing transcripts, so that the trial court in the false-arrest case can fully review the previous record to determine the "meaning and preclusive force to be accorded [the previous court's] ruling . . . by resort solely to the face of the judgment roll . . . ." *Id.* at 1062. Failure to submit the entire judgment roll "is fatal to [an] issue-preclusion defense" on summary judgment. *Id.* Summary judgment should have been denied for this reason alone.

### B. Excessive force claim

A finding of probable cause for an arrest does not preclude an excessive-force claim. *See Dixon v. Richer*, 922 F.2d 1456, 1459 (10th Cir. 1991) ("Even if the second issue–whether Richer and Yarbrough had probable cause to arrest the

Dixons–were decided in the prior proceeding, it would not preclude litigation of the critical issue whether Richer and Yarbrough used unreasonably excessive force in arresting the Dixons.").

The district court summarily dismissed Gouskos's excessive force claim, stating:

> [T]he Court **FINDS** that the Plaintiff has not shown, by the facts alleged and by the evidence and argument contained in the record, that his constitutional right to be free from excessive use of force was violated. Plaintiff failed to meet his burden of proof as set forth in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Therefore, Defendant Trooper Joseph D. Griffith is entitled to Qualified Immunity and his Motion for Summary Judgement is hereby **GRANTED**.

Aplt. App., Vol. II at 617. Gouskos raises four issues on appeal regarding this ruling: that the court failed to provide a substantive explanation for its ruling; that it used the wrong legal standard on summary judgment by resolving disputed facts in favor of Griffith; that it failed to recognize the existence of genuine issues of material facts; and that it substantively erred in granting qualified immunity to Griffith on the facts Gouskos alleged. A review of the controlling case law and the record supports Gouskos's arguments.

*Saucier* requires a two-part analysis: first, the court determines whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. If they do, the court then determines whether the right was clearly

-21-

established at the time of the alleged conduct. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

The law has long been settled that "law enforcement officers must be 'objectively reasonable' in their searches and seizures." *Dixon*, 922 F.2d at 1461.

> Determining whether force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . . Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.
>
> . . . .
>
> In applying this standard, we are to consider the evidence in the light most favorable to [the person who was arrested].

*Id.* at 1462 (alterations, citations, and quotations omitted). Gouskos presented testimony that Griffith used excessive force by (1) tackling him when he was unarmed and presented no threat to anyone, was engaged in lawful behavior, and

had not been told that he was under arrest; (2) putting him in a chokehold and choking him almost to unconsciousness when he was already on the ground, he was exclaiming that he was not resisting, and three other officers were sitting on him, holding his legs, and handcuffing him; and (3) stepping on his back so that he could not breathe after he was handcuffed behind his back and lay totally subdued on his stomach.

In his summary judgment motion, Griffith invited the district court to determine the first prong of *Saucier* (whether Griffith had violated a constitutional right by engaging in the acts alleged by Gouskos) by relying *solely* on Griffith's disputed deposition testimony. This was improper. *See Mick v. Brewer*, 76 F.3d 1127, 1136-37 (10th Cir. 1996) (reversing summary judgment on issue of qualified immunity in excessive force case because district court ignored testimony of eyewitnesses in favor of officer's disputed testimony). Further, although Griffith claims he saw Gouskos chest-butt McAtee and heard McAtee tell Gouskos that he was under arrest (which Gouskos disputes), he fails to even address Gouskos's claims that Griffith also used excessive force by choking him almost to unconsciousness after Gouskos stopped struggling and by stomping on his back after he was totally subdued. *See* Aplt. App., Vol. I at 281-85.

On appeal, Griffith alleges a plethora of facts that he claims established a dangerous situation and the reasonableness of his behavior as a matter of law, but

-23-

those facts do not support the use of the excessive force alleged. For example, Griffith claims that Gouskos's crime was "of great significance" because Gouskos was charged with felony assault of an officer. Aplee. Br. at 18. But whether Gouskos ever "chest-butted" McAtee is a disputed issue. Griffith maintains that he reasonably perceived Gouskos to be a threat because of his size (6'1", 225 lbs.), because he had a black eye (from an unrelated prior event), and because he was not wearing shoes. *Id.* at 19. But size alone will not establish a reasonable basis for perceiving someone to be a threat, and it is for a jury to decide whether Griffith, who tackled Gouskos from Gouskos's right rear side at night, actually saw that Gouskos's left eye was black. He also claims Gouskos was a threat because he was yelling at McAtee. But Bahnmaier testified that Gouskos did not yell and Griffith testified that Gouskos's alleged yelling was "something to the effect of either 'you can't tell me what to do' or 'I'm taking them anyway,'" Aplt. App., Vol. I at 343, and not of threats of violence. Further, Gouskos insists that he told McAtee only that he had as much right to be there as McAtee did, which is not a threatening statement.

Griffith claims dangerous circumstances because the party had previously gotten out of hand, "children" were taunting officers by singing songs and giving them the "finger," and there was broken glass and blood on the sidewalk. Aplee. Br. at 19. But none of these facts has anything to do with Griffith's decision to

-24-

tackle Gouskos from behind in light of the record demonstrating that Griffith knew Gouskos was a parent who was there to pick up his daughter (and therefore not involved in the prior party problem), and that McAtee approached Gouskos when Gouskos was trying to leave the scene. Aplt. App., Vol. I at 343. The summary judgment record indicates that, when Griffith tackled Gouskos, the scene outside was fully under control and the young adults whose parents had not yet arrived were still in the house. Our careful review of the summary judgment record indicates that there was no evidence of any kind of violence after the police came to the scene, except for (1) the police kicking open the front door of the house (without a warrant) after Gouskos's arrest, and knocking it into the head of an occupant, (2) Griffith's kicking and choking of Gouskos, and (3) someone throwing a beer bottle at Officer Rains, who was holding Gouskos's legs down while Griffith was choking him.

Further, none of these questions of facts are relevant to Griffith's decision to continue to choke-hold and then stomp on Gouskos's back after Gouskos was lying subdued and handcuffed.

Griffith claims that, because Gouskos allegedly bit him when Griffith was choking him, Griffith's behavior was reasonable. This assertion begs the question whether the choking was a reasonable response in the first place, and, again, Gouskos disputes that he bit Griffith. But even if he did, "[w]hen an officer in

making a lawful arrest uses more force or aggression than is reasonably necessary, the party so assaulted has the right of self-defense and may repel the attack with sufficient force to avert its threatened consequences, using no more force than is necessary." *Carter v. State*, 507 P.2d 932, 934 (Okla. Crim. App. 1973). A jury should decide whether Griffith's and Gouskos's responses were reasonable.

Gouskos pointed out to the district court that there were genuine issues of material fact regarding whether Griffith's alleged perceptions were reasonable or whether he was lying and whether Gouskos was struggling to avoid being handcuffed or simply trying to avoid injury while he was being knocked to the ground. He also argued that Griffith had failed to rebut witness testimony that Griffith continued to choke Gouskos and stomped on his back after he had been subdued and handcuffed. Aplt. App., Vol. II at 387-88. We conclude that the district court improperly resolved the excessive force/qualified immunity issue by totally discounting Gouskos's and his eyewitnesses' testimony. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) ("[T]his court will not approve summary judgment in excessive force cases–based on qualified immunity or otherwise–if the moving party has not quieted all disputed issues of material fact."); *Mick*, 76 F.3d at 1136-37; *Dixon*, 922 F.2d at 1463 (holding that post-arrest kicking, beating, and choking of plaintiff was constitutionally

excessive in light of the fact that the plaintiff had made no additional "aggressive moves or threats" toward officer).

The judgment of the district court is REVERSED and REMANDED for further proceedings.

Entered for the Court


J. Thomas Marten
District Judge