**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 1, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VANESSA ARNOLD,

      Plaintiff-Appellee,

and

LORENZO CASTILLO,

      Plaintiff,

v.

SKIP CURTIS, a Utah County
Sheriff's Deputy,

      Defendant-Appellant.

No. 06-4080
(D.C. No. 2:04-CV-564-DAK)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **McKAY**, and **GORSUCH**, Circuit Judges.

Because qualified immunity is designed to protect law enforcement officers doing their job within the bounds of law by providing them an immunity from suit – not just having to stand trial – we seek to resolve the issue at the earliest possible stage. In some cases, however, we are unable to do so. This is one such

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

case. The parties in this interlocutory appeal present dueling and radically divergent accounts of a skirmish between them, and which factual story one credits will very likely determine the appropriate legal disposition of their dispute. Under these circumstances, where unresolved and material factual disputes control the legal analysis, we are unable to resolve the question of qualified immunity at the summary judgment stage and thus dismiss this interlocutory appeal in favor of further proceedings in the district court.

* * *

*Ms. Arnold's Narrative.* According to Vanessa Arnold and Lorenzo Castillo,[1] they learned the hard way not to talk during a movie. Together they ventured to a Sunday afternoon matinee showing of the movie *Troy* in a Provo, Utah theater, sitting in the last row of the theater where they chatted during the previews. *See* Aplt. App. at 136, 291-95. Before the movie started, an off-duty Utah sheriff's deputy, Harold "Skip" Curtis, seated nearby in plain clothes with his wife, confronted Ms. Arnold and Mr. Castillo. *See id.* at 295-96. Specifically, Mr. Curtis told Ms. Arnold to "shut up" three times; called her a "bitch"; and made a racial slur about Ms. Arnold's Hispanic background. *See id.* at 137-39, 296-98. Ms. Arnold and Mr. Castillo did not respond to Mr. Curtis.

---

[1] Mr. Castillo is no longer a party to this appeal, as he and Mr. Curtis have settled.

*See id.* at 138-39. They remained generally silent throughout the movie. *See id.* at 139-44.

After the movie ended, Mr. Castillo stood, approached Mr. Curtis, and asked him to apologize to Ms. Arnold. *See id.* at 144-48, 196-97, 311. Mr. Curtis responded by asking Mr. Castillo if he "want[ed] to play." Aplt. App. at 164, 168, 197. Mr. Curtis also declared that he was a police officer, told Mr. Castillo that he was under arrest, and grabbed Mr. Castillo by the shoulder. *See id.* at 148-49, 162-64, 197, 311-15. Ms. Arnold then began pleading with Mr. Curtis in Spanish to let go of Mr. Castillo. *See id.* at 164-65, 172, 315-19.

At this point, Mr. Curtis grabbed Ms. Arnold with both of his hands and then lifted, turned, and threw her down the stairs. *See id.* at 172-77, 316, 319-20, 322-27. She landed on her back and head. *See id.* at 177, 320. While Ms. Arnold cried for help as she lay sprawled on the stairs, Mr. Curtis detained Mr. Castillo, prevented him from assisting her, and escorted him from the theater into a hallway. *See id.* at 177-79, 320-22, 327-28; *see also generally id.* at 543-46 (affidavit of witness Betty Dohse). There Mr. Curtis flashed his badge to a theater employee and demanded Mr. Castillo's identification. *See* Aplt. App. at 178-79. Calling Mr. Castillo "stupid," Mr. Curtis escorted him to the door of the parking garage. *Id.* at 180. After calling into police dispatch, Mr. Curtis informed Mr. Castillo that he had an outstanding warrant related to a car accident.

*See id.* at 180, 183. Instead of continuing his detention of Mr. Castillo, however, Mr. Curtis released him. *See id.* at 180-81.

Meanwhile, back in the theater, a couple assisted Ms. Arnold off the stairs and into a restroom, where Ms. Arnold experienced pain in her neck, the back of her head, her right eye, her lower back, and her arm. *See id.* at 328-337. Paramedics arrived, placed Ms. Arnold on a stretcher, and took her to the hospital. *See id.* at 182-83, 192-93, 337. Ms. Arnold continues to complain of, among other things, a painful lump on the back of her head; headaches for which she takes prescribed medications; lasting vision problems; and fainting spells. *See id.* at 377-97.

*Mr. Curtis's Narrative.* Mr. Curtis presents a much different story, in which Mr. Castillo – not he – provoked the incident that afternoon in the Provo theater. After listening to Ms. Arnold and Mr. Castillo talk through the previews and minutes into the feature film, Mr. Curtis turned around from his second-to-last-row seat and politely asked the last-row-sitting pair to refrain from talking during the movie. *See* Aplt. App. at 33-37. According to Mr. Curtis, Ms. Arnold and Mr. Castillo continued to talk, so he stood up, walked over a couple seats, faced Mr. Castillo, reminded him that he already asked them "nice[ly]" to stop talking, and told him that, unless Mr. Castillo would like to buy Mr. and Mrs. Curtis's movie tickets, the pair must stop talking. *See id.* at 36-37.

Mr. Curtis testified that Mr. Castillo and Ms. Arnold continued to talk throughout the entire movie, including on a cell phone. *See id.* at 39, 41-42. After sitting through most or all of the end-of-the-movie credits, Mr. Castillo approached Mr. Curtis, several times demanded his apology, and told Mr. Curtis that he could not leave until the matter was settled; Mr. Castillo's clenched his fists, and Mr. Curtis understood him to threaten a fight. *See id.* at 38-41, 43. In an "attempt[] to de-escalate the situation," Mr. Curtis informed Mr. Castillo that he was a police officer and displayed his badge. *See id.* at 41.

At this point, Mr. Curtis testified that Ms. Arnold "screamed no, no, no" and "reached over and grabbed [his] arm, [his] hand, [and his] wrist." *Id.* at 43, 47. Ms. Arnold continued to "attack" Mr. Curtis by grabbing his right arm and wrist as he escorted Mr. Castillo toward the end of the row. *See* Aplt. App. at 43-47. A screaming Ms. Arnold grabbed Mr. Curtis by his waist, pressed his left arm to his side, and rested her hand atop of his concealed gun. *See id.* at 50-52. Mr. Curtis told Mr. Castillo to call off Ms. Arnold, both of whom initially complied. *See id.* But, as Mr. Curtis proceeded to escort Mr. Castillo down the stairs, Ms. Arnold again grabbed Mr. Curtis around the waist. *See id.* at 52-53. Mr. Curtis again told Mr. Castillo to call her off, and again Ms. Arnold eventually complied. *See id.* at 58. Ms. Arnold then ran between Mr. Curtis and Mr. Castillo – knocking Mr. Curtis's hand off of Mr. Castillo's arm – and stood in front of the two as they walked down the stairs. *See id.* at 59-60. For the third time, Mr.

Curtis instructed Mr. Castillo to call her off, and yet again she complied. *See* Aplt. App. at 60-61.

As Ms. Arnold walked backward down the stairs while Mr. Curtis and Mr. Castillo continued down, Mr. Curtis "very well could have bumped into her or pushed her." *Id.* Ms. Arnold fell backward down the stairs, where Mr. Curtis saw her "laying face up down the stairs in front of" them. *Id.* at 61. Mr. Curtis testified that he in no manner picked up Ms. Arnold or tossed her down the stairs. To the contrary, one witness, Cheri Lockhart, testified that Mr. Castillo took a swing at Mr. Curtis, Ms. Arnold "hysterically" attacked Mr. Curtis, Mr. Curtis grabbed Ms. Arnold in self defense, and Ms. Arnold fell down stairs. *See id.* at 427-28, 433-36.

Mr. Curtis testified that he escorted Mr. Castillo to the theater's parking garage, where Mr. Curtis asked Mr. Castillo for identification. *See id.* at 70. Mr. Castillo stated it was in his back pocket, and Mr. Curtis retrieved it. *See id.* After calling the police dispatch, Mr. Curtis learned that Mr. Castillo had an outstanding warrant and a suspended license. *See* Aplt. App. at 71. Based upon his experience with Salt Lake City's practice with respect to the enforcement of warrants in similar situations, along with his concern for his wife who had departed the area, Mr. Curtis released Mr. Castillo. *See id.* at 71-76; *see generally id.* at 92-100.

*District Court Proceedings.* Ms. Arnold brought this suit under 42 U.S.C. § 1983 alleging that Mr. Curtis violated her Fourth Amendment rights by employing excessive force when he – unprovoked – intentionally grabbed her, lifted her, turned her, and tossed her down the stairs. Mr. Curtis responded by filing a motion for summary judgment invoking the defense of qualified immunity. The district court denied Mr. Curtis's motion, holding that, if a jury credits the testimony and evidence adduced by Ms. Arnold, Mr. Curtis violated Ms. Arnold's clearly established rights. Mr. Curtis thereafter filed this interlocutory appeal.

* * *

While we generally adhere to the rule that only final district court orders and judgments are appealable under 28 U.S.C. § 1291, the Supreme Court in *Cohen v. Beneficial Industrial Loan Corporation* recognized that there are a "small class" of cases in which we should give that statute a "practical rather than technical construction," exercising appellate jurisdiction over interlocutory appeals that are "too important" and "too independent" to wait until it is "too late effectively to review the . . . order [so that] the rights conferred by the statute, if it is applicable, will have been lost, probably irreparably" – but only "so long as the matter [does not] remain[] open, unfinished or inconclusive." 337 U.S. 541, 546-47 (1949).

Qualified immunity often fits well into this mold. Because it is an immunity from suit rather than a mere defense to liability, its utility is greatly diminished if a case is mistakenly permitted to proceed to trial. *See Scott v. Harris*, 127 S. Ct. 1769, 1774 n.2 (2007); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Indeed, the Supreme Court has repeatedly emphasized the importance of resolving immunity questions "at the earliest possible stage in litigation." *Scott*, 127 S. Ct. at 1774 n.2 (citing *Mitchell*, 472 U.S. at 527); *see also Boles v. Neet*, 486 F.3d 1177, 1179 n.1 (10th Cir. 2007) (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 515 (10th Cir. 1998)). Once the defendant asserts the qualified-immunity defense, the plaintiff bears the "heavy two-part burden" of demonstrating: (1) the defendant's violation of a constitutional right; and (2) the "infringed right at issue was clearly established at the time of the allegedly unlawful activity such that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal." *Martinez v. Carr*, 479 F.3d 1292, 1294-95 (10th Cir. 2007); *see also Hannula v. City of Lakewood*, 907 F.2d 129, 131 (10th Cir. 1990), *abrogated on other grounds by Dixon v. Richer*, 922 F.2d 1456, 1461 (10th Cir. 1991); *Callahan v. Millard County*, --- F.3d ---, 2007 WL 2028971, *2 (10th Cir. 2007).

Still, orders denying qualified immunity before trial are appealable on an interlocutory basis only to the extent they implicate issues of law. *See Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1137 (10th Cir. 2006) (citing *Behrens v.*

*Pelletier*, 516 U.S. 299, 313 (1996)); *accord Perez v. Ellington*, 421 F.3d 1128, 1131 (10th Cir. 2005) (citing *Mitchell*, 472 U.S. at 528). These issues generally include whether, under the plaintiff's version of the facts, the defendant violated the plaintiff's constitutional rights and, if so, whether the law at the time of the transactions in question clearly established the right so as to put the defendant on notice of the perils of his or her actions. *See, e.g.*, *Martinez*, 479 F.3d at 1294-95 (citing, *inter alia*, *Mitchell*, 472 U.S. at 527-28); *Foote v. Spiegel*, 118 F.3d 1416, 1422 (10th Cir. 1997); *Allen v. Muskogee, Okla.*, 119 F.3d 837, 841 (10th Cir. 1997). But defendant governmental officials cannot appeal the pretrial denial of qualified immunity to the extent that the district court order decides nothing more than that the facts, as asserted by the plaintiff, are sufficiently supported by the evidence to survive summary judgment. *See Foote*, 118 F.3d at 1422-23 (citing *Johnson v. Jones*, 515 U.S. 304, 312-14 (1995)). Whether inside or outside the qualified immunity context, it is not our province to act as fact finders on summary judgment. This combination of rules thus seeks to mediate "the conflict between our simultaneous desires to hold public officials to standards of lawful behavior, to protect public officials who have behaved reasonably against the many burdens required to establish reasonableness through the full trial process, and to maintain the values served by the final judgment rule." Wright & Miller, 15A Fed. Prac. & Proc. Juris. 2d § 3914.10.

In the appeal at hand, the legal questions are settled and largely undisputed. At the time of the encounter, there is no question that the Fourth Amendment right to be free from excessive force clearly embraced the right of an innocent citizen to attend a movie without being seized by a self-identified law enforcement officer and thrown down a staircase.[2] We do not understand Mr. Curtis as asking us to conclude otherwise. Likewise, there can be no serious question that, if the jury credits the facts she has developed in this record, Ms. Arnold states a claim for relief under this clearly established law.

Instead, the only real question posed by Mr. Curtis is whether his version of the facts is more credible than Ms. Arnold's. We readily acknowledge that Mr.

---

[2] *See, e.g.*, *Walker v. City of Orem*, 451 F.3d 1139, 1159-60 (10th Cir. 2006) (holding, under totality of circumstances, that officers violated clearly established law by employing excessive force in shooting man standing over twenty feet away who possessed a knife, "previously eluded police, nearly running over an officer, and had driven recklessly just prior to the incident" because officer acted "precipitously," man "posed a danger only to himself," and "[t]he crimes at issue (theft of the vehicle, eluding the officers) were not particularly severe"); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185, 1193 (10th Cir. 2001) (internal citation omitted) (holding officer acted unreasonably – and thus, with excessive force – when, unprovoked yet without causing any physical harm, pointed firearm at individuals within home during execution of search warrant; "[w]here a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use"); *Dixon v. Richer*, 922 F.2d 1456, 1464 (10th Cir. 1991) (holding as clearly established violation of Fourth Amendment's protection against excessive force police officers' beating male driver – and subsequently female passenger, after she pled for officers to stop beating man – following couple's departure from restaurant where brother caused property damage).

Curtis vigorously disputed this characterization of his appeal at oral argument. But at every turn in his brief and argument to us, he rests his appeal on a highly contested version of the events in question. For example, Mr. Curtis:

1. outlines the facts as if it were settled that Ms. Arnold and Mr. Castillo, as opposed to he, provoked the confrontation in the theater;

2. omits reference to Ms. Arnold's allegation that, unprovoked, he told her and Mr. Castillo to "shut up" three times, called Ms. Arnold a "bitch," and made a racial slur;

3. fails to reference Ms. Arnold and Mr. Castillo's pertinent testimony and instead selectively cites to other witness testimony – indeed, Mr. Curtis does not mention that he asked Mr. Castillo if he "want[ed] to play" when Mr. Castillo asked Mr. Curtis to apologize to Ms. Arnold;

4. fails to acknowledge testimony from Ms. Arnold and her witnesses, that he – unprovoked – grabbed, picked up, turned, and tossed Ms. Arnold down the theater stairs, instead reciting the facts as if Ms. Arnold accidentally fell down the stairs during her aggressive actions toward him during the commotion; and

5. disputes the contention that he prevented Mr. Castillo from assisting the injured Ms. Arnold, instead testifying that the uninjured Ms. Arnold walked out of the auditorium.

*See* Aplt. Op. Br. at 5-12. Perhaps most detrimentally to his effort to invoke our jurisdiction, Mr. Curtis then employs only his own, materially disputed version of the facts as the basis of his legal argument that he acted reasonably, and therefore lawfully, discounting entirely Ms. Arnold's record evidence to the contrary. *See id.* at 12-52 (outlining reasonableness of Mr. Curtis's actions under his version of facts as opposed to Ms. Arnold and Mr. Curtis's version of facts); *see also*

*generally* Aplt. Reply Br. (disputing Ms. Arnold and Mr. Castillo's factual assertions; again analyzing Mr. Curtis's reasonableness under his version of facts).

To be sure, a jury is free to credit Mr. Curtis and his witnesses over Ms. Arnold and hers. But when a qualified immunity claimant rests his or her interlocutory appeal on a dispute over material facts, rather than law, we are without jurisdiction to hear it. Accordingly, this interlocutory appeal is dismissed.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge