**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DERON McCOY, JR.,

     Plaintiff - Appellant,

v.

TYSON MEYERS; DARRIN
PICKERING; BRICE BURLIE,

     Defendants - Appellees.

No. 17-3093

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:12-CV-03160-CM)**
_____

Brian A. Jackson and Alexandra L. Sorenson, Shook, Hardy & Bacon LLP, Kansas City, Missouri, for Plaintiff-Appellant.

William D. Cross, (Michael K. Seck and Kenneth J. Berra with him on the brief), Fisher, Patterson, Sayler & Smith, L.L.P., Overland Park, Kansas, for Defendants-Appellees.
_____

Before **LUCERO**, **KELLY**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

On March 22, 2011, Hutchinson, Kansas police officers responded to a reported armed hostage situation and arrested DeRon McCoy, Jr. The officers brought him to the ground, struck him, and rendered him unconscious with a carotid restraint maneuver.

While he was unconscious, they handcuffed his arms behind his back, zip-tied his legs together, and moved him into a seated position. As he regained consciousness, the officers resumed striking him and placed him into a second carotid restraint, rendering him unconscious a second time.

Based on this incident, Mr. McCoy sued three of the officers who participated in his arrest—Tyson Meyers, Darrin Pickering, and Brice Burlie (collectively, the "Appellees")—under 42 U.S.C. § 1983. He alleged that they violated his Fourth Amendment right to be free from excessive force. The Appellees moved for summary judgment on qualified immunity grounds. The district court granted the motion, determining that (1) the Appellees had acted reasonably under the circumstances, and (2) the relevant law was not clearly established at the time of the Appellees' alleged conduct. Mr. McCoy now appeals.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part because the Appellees are entitled to qualified immunity (1) for their conduct before Mr. McCoy's arms and legs were bound while he was unconscious, but (2) not for their conduct after this point.

## I. BACKGROUND

### A. *Factual History*

The following factual history is drawn from the parties' statement of uncontroverted facts and from the record, viewed in the light most favorable to Mr. McCoy, the non-moving party. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (on summary judgment, "a court must view the evidence in the light most favorable to the

2

opposing party" and "draw[] inferences in favor of the nonmovant" (quotations omitted)). We therefore resolve "genuine disputes of fact" in the record in favor of Mr. McCoy. *See id.* But for "dispositive issues on which [Mr. McCoy] will bear the burden of proof at trial," the record must contain evidence that is "based on more than mere speculation, conjecture, or surmise." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (quotations omitted).

1. **Events Leading to Mr. McCoy's Arrest**

On March 20, 2011, Mr. McCoy checked into a room at the Budget Inn in Hutchinson, Kansas, with his infant daughter and his sister. Sometime on March 22, 2011—while the three were inside the motel room—Leanna Daniels, the mother of Mr. McCoy's daughter, and Gwendolyn Roby, Ms. Daniels's friend, arrived at the motel. Ms. Roby called the police when she realized Mr. McCoy was not going to allow Ms. Daniels to take her daughter. Ms. Roby told the police that Mr. McCoy was at a motel with his daughter and sister, that he would not give the daughter to Ms. Daniels, and that he had a gun.

The Hutchinson police arrived at the Budget Inn around 4:38 p.m. They attempted to contact Mr. McCoy, but he did not respond and remained inside the motel room. Around 6:40 p.m., the police requested assistance from the Emergency Response Team (the "ERT"), a special law enforcement unit trained to respond to unusually dangerous circumstances, including hostage situations.

Officers Meyers, Pickering, and Burlie—all ERT members—reported to the Budget Inn with the rest of the ERT. Upon their arrival, they were told that they were

3

responding to a hostage situation involving an armed male with a female and a baby. After determining that no sound was emanating from Mr. McCoy's motel room, the ERT command decided to send in a five-member team to secure the room, extricate the hostages, and arrest Mr. McCoy. Officer Burlie, the ERT's assistant team leader, selected himself and four other ERT members—including Officer Pickering—for the task. Officer Meyers was assigned to stay back and hold a ballistics blanket to provide cover for the five-member team as they approached the door.

2.  **Mr. McCoy's Arrest**

Around 9:05 p.m., the five-member team entered Mr. McCoy's motel room with a master key. As the door opened, the Appellees and several other officers heard Mr. McCoy yell "[g]et back." App., Vol. II at 417-18; App., Vol. V at 1061. The team then entered in a "stack" formation, one after another, with Officer Pickering leading. When the team entered the room, Mr. McCoy was on the bed with his sister and his daughter.

Upon entering the room, each of the five officers saw Mr. McCoy holding a gun.[1] Mr. McCoy alternated between pointing the gun in his sister's direction and pointing it at

---

[1] Four of the officers—Appellees Pickering and Burlie, Jeramy Hedges, and Corey Graber—testified that they had seen Mr. McCoy holding a gun. App., Vol. II at 418; App., Vol. V at 1061. Officers Hedges and Graber, ERT members from the Reno County Sheriff's Department, were originally named as defendants in this litigation but have been voluntarily dismissed from this appeal. The fifth officer, Bryan Carey, was never named as a defendant and thus was not deposed. Officer Carey stated in his police report, written the day after the arrest, that he had seen Mr. McCoy holding a gun. App., Vol. IV at 847-48. Mr. McCoy "does not deny that a gun was in his possession." Aplt. Br. at 5.

4

the first three officers to enter, including Officers Pickering and Burlie.[2] Officer Meyers, who was still staying back with the ballistics blanket, heard several officers shouting, "Drop the gun, drop the gun," immediately after they entered the room. App., Vol. II at 419; App., Vol. V at 1061.

Approximately 30 to 45 seconds after the officers first shouted out "drop the gun," Mr. McCoy dropped the gun. One of the officers removed the gun from the room, and someone announced that the gun was out. After the gun was removed, Officer Burlie jumped onto the bed, attempting to arrest Mr. McCoy. While Officer Burlie was on the bed, Mr. McCoy's sister and daughter were cleared from the immediate area and removed from the room. After determining that Mr. McCoy's sister and daughter were clear, Officer Burlie pulled Mr. McCoy off the bed to arrest him. Officer Burlie perceived that Mr. McCoy was reaching for his duty weapon and yelled out, "He's grabbing my gun." App., Vol. II at 423-24; App., Vol. V at 1063.[3]

---

[2] In his brief, Mr. McCoy "denies ever pointing the gun toward Appellees," citing his deposition testimony to the contrary. Aplt. Br. at 5. He further argues that the district court improperly applied *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), when it found that he had pointed the gun based on his later convictions for aggravated assaults on Officers Pickering, Graber, and Burlie. *Id.* at 41-42. Mr. McCoy's counsel, however, conceded this issue at oral argument. Oral Argument at 14:18-14:25 ("[W]e understand and [] agree that *Heck* forecloses Mr. McCoy's [testimony] as to that point.").

[3] In his brief, Mr. McCoy "denies [that] he ever reached for Appellee Burlie's weapon," citing his deposition testimony to the contrary and the fact that he was later acquitted of a criminal charge relating to that conduct. Aplt. Br. at 6. He further contends that "at this stage of the litigation [this court] must accept [Mr. McCoy's] view." *Id.* at 12. But at oral argument, counsel clarified Mr. McCoy's position: "Whether or not that happened [] doesn't matter as we agree it's the reasonable officer's perception. They are entitled to believe he's reaching for the gun." Oral Argument at

a. *The allegedly excessive force*

Mr. McCoy does not allege that the Appellees used any excessive force up to this point. He alleges their use of force became excessive only after Mr. Burlie pulled him onto the ground.

Later in this opinion, we separate our legal analysis between what happened before and after Mr. McCoy was rendered unconscious, handcuffed, and zip-tied. We therefore present the relevant facts—including both the Appellees' and Mr. McCoy's conduct—for each period separately. We refer to the two periods as "pre-restraint" and "post-restraint."

### i. Pre-restraint period

Once Mr. McCoy was on the ground, lying face-down with his hands behind his back, Officer Pickering "immediately" placed him in a carotid restraint. App., Vol. II at 470-71, 477-78.[4] Unidentified officers "simultaneously" pinned Mr. McCoy down and

7:08-7:16. We thus accept the Appellees' allegations that Officer Burlie had perceived Mr. McCoy reaching for his duty weapon.

[4] Officer Pickering had previously received training on a technique called the Lateral Vascular Neck Restraint ("LVNR") and was certified as an instructor on that technique by the National Law Enforcement Training Center. Although the Hutchinson Police Department did not have an official policy on the use of the LVNR, the Chief of Police had authorized Officer Pickering and Officer Meyers, also a certified instructor, to use this technique in performing their duties. According to the Appellees' expert, the LVNR does not "focus on restricting [] air intake" but instead uses a "bi-lateral restraint[] . . . intended to affect the circulatory system of the [subject], interrupting . . . the natural flow of blood to and from the brain." App., Vol. IV at 1046.
    As far as we can tell, the LVNR is a "carotid" restraint as opposed to a "bar arm" restraint. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 97 n.1 (1983) (explaining that the terms "'control holds,' 'chokeholds,' 'strangleholds,' and 'neck restraints[]' [a]ll . . . refer to two basic control procedures: the 'carotid' hold[,] [which] . . . is capable of

hit him in the head, shoulders, back, and arms. *Id.* at 480; *see also id.* at 470-71. Officer

Pickering maintained the carotid restraint for approximately five to ten seconds and

increased pressure, even though Mr. McCoy was not resisting, thereby causing Mr.

McCoy to lose consciousness.[5]

---

rendering the subject unconscious by diminishing the flow of oxygenated blood to the brain[,] [or] [t]he 'bar arm' hold, which . . . reduces the flow of oxygen to the lungs, and may render the subject unconscious"); *Estate of Booker v. Gomez*, 745 F.3d 405, 413 & n.6 (10th Cir. 2014) (distinguishing a carotid restraint, which restricts blood flow, from the "more dangerous" bar arm hold, which restricts oxygen flow).

      Officer Pickering testified that the technique he used on Mr. McCoy was the LVNR. App., Vol. III at 593. Mr. McCoy contends that a reasonable jury could conclude that Officer Pickering applied a bar arm restraint instead of a carotid restraint, as described in *Lyons*. *See* Aplt. Br. 37. But the only record evidence that supports Mr. McCoy's contention is Officer Burlie's police report, in which Officer Burlie wrote that Officers Meyers and Pickering "set [Mr. McCoy] up and began patting him on his back to help him start breathing again" after he first lost consciousness. App., Vol. IV at 832. The "[e]vidence, including testimony, must be based on more than mere speculation, conjecture, or surmise," and "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *Cardoso*, 490 F.3d at 1197 (quotations omitted). Here, Officer Burlie's police report statement is unsubstantiated. As he later testified, he "never once checked to see if [Mr. McCoy] was breathing and [] didn't know if he was breathing." App., Vol. II at 507. Instead, he merely "misspoke" in the police report and "meant to say [that] [Mr. McCoy] was unconscious." *Id.* Additionally, Mr. McCoy testified that he had no personal knowledge that he stopped breathing and only "got that information from . . . Brice Burlie's police report." *Id.* at 479.

      Because Mr. McCoy's assertion that Officer Pickering applied a bar arm hold on him lacks adequate record support, we do not resolve this factual dispute in Mr. McCoy's favor. In any event, even assuming the record establishes a genuine factual dispute, this dispute is immaterial because, as our discussion below shows, we do not rely on the specific type of control technique as a factor in our analysis.

    [5] The facts relating to the pre-restraint force are taken from Mr. McCoy's testimony. The Appellees' testimony contradicts Mr. McCoy's testimony in some respects. *See, e.g.*, App., Vol. II at 505 (Officer Burlie testifying that Mr. McCoy was "sitting up" when Officer Pickering applied the carotid restraint); *id.* at 434-36 (collecting the Appellees' testimony that, during this time, they each did not hit or strike Mr. McCoy or observe others doing so); App., Vol. III at 593 (Officer Pickering testifying that Mr. McCoy "was resisting" when he applied the carotid restraint). We resolve these factual

While Mr. McCoy was unconscious, the officers handcuffed his hands behind his back and zip-tied his feet together. *See* App., Vol. II at 471-72 (Mr. McCoy testifying that the next thing he remembered was "coming to" and that "when [he] came to [he] was in a sitting position with [his] legs zip tied and [his] hands handcuffed behind [his] back"); *see also* App., Vol. III at 595 (Officer Pickering affirming at his deposition that "at this point in time, Mr. McCoy [was] unconscious . . . [a]nd handcuffed . . . [w]ith zip ties around his ankles"); App., Vol. V at 1314 (Officer Burlie affirming at his deposition that when Mr. McCoy "eventually [came] to," he was handcuffed and his legs were restrained).[6]

### ii. Post-restraint period

Officer Meyers entered the motel room while Mr. McCoy was unconscious to perform a revival technique known as a "kidney slap," which consists of "a slight tap to the lower back." App., Vol. III at 632.[7] Officer Meyers positioned himself behind Mr.

---

disputes in Mr. McCoy's favor under the applicable summary judgment standards. *See White*, 908 F.2d at 670 ("All disputed facts must be resolved in favor of the party resisting summary judgment."); *see also Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) ("It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment.").

[6] According to Officer Burlie's uncontroverted testimony, Mr. McCoy was unconscious for approximately 10 to 15 seconds. App., Vol. II at 426, 506; App., Vol. V at 1065]. But to the extent that 10 to 15 seconds would have been insufficient time for the Appellees to handcuff and zip-tie Mr. McCoy, as other record evidence indicates they did while he was unconscious, we resolve this inconsistency in Mr. McCoy's favor.

[7] This description of the "kidney slap" technique is taken from Officer Meyers's testimony, which is undisputed by Mr. McCoy. As part of his LVNR training, Officer Meyers had learned to perform this technique on an individual who loses consciousness during application of the LVNR.

8

McCoy, moved Mr. McCoy into a sitting position, and performed the kidney slap. App., Vol. II at 428; App., Vol. V at 1066.[8]

As Mr. McCoy regained consciousness, unidentified officers again struck him—more than 10 times—on his head, shoulders, back, and arms. App., Vol. II at 471-72.[9] Mr. McCoy tried to shield himself but realized he was handcuffed and zip-tied. *Id.* at 472. He yelled out, "[S]omebody help." *Id.*; *see also id.* at 508 (Officer Burlie testifying that Mr. McCoy "looked like he was really scared" at this time and "was using [the words], 'Oh God, please help me, please help me'"). Officer Meyers then placed Mr. McCoy, who was not resisting, in a second carotid restraint for less than 10 seconds, maintaining pressure until Mr. McCoy lost consciousness again. App., Vol. II at 472, 478; App., Vol. III at 636.[10]

---

[8] In the district court, the parties disputed how much force Officer Meyers used in performing the kidney slap. *See* App., Vol. V at 1067. But Mr. McCoy previously testified he "ha[d] no personal knowledge of how [Officer Meyers] resuscitated [him]." App., Vol. V at 1287. We therefore have no basis for concluding that Officer Meyers applied more force than required to perform the kidney slap.

[9] According to the Appellees' testimony, they neither struck nor observed anyone else strike Mr. McCoy at this time—with the exception of Officer Meyers's kidney slap. *See* App., Vol. II at 434-36 (collecting testimony). We resolve this factual dispute in Mr. McCoy's favor.

[10] According to Officer Meyers's testimony and contrary to Mr. McCoy's testimony, Mr. McCoy never lost consciousness as a result of the second carotid restraint. App., Vol. III at 636. We resolve this factual dispute in Mr. McCoy's favor. But we reject Mr. McCoy's further allegation, Aplt. Br. at 10, that he stopped breathing from the second carotid restraint. The record contains no basis for this allegation. Officer Burlie's report—the source of Mr. McCoy's belief that he stopped breathing—omits any mention of the second carotid restraint. *See* App., Vol. IV at 829-32.

Officer Meyers further testified that he had initially placed his arms around Mr. McCoy's neck *without* applying any pressure, in accordance with his training, as a

9

Mr. McCoy was then removed from the motel room and put into a police car outside.[11] Less than ten minutes had elapsed between the five-member team's entry into the room and Mr. McCoy's removal.

3. **Mr. McCoy's Injuries**

Mr. McCoy was then transported to the hospital, where doctors determined that nothing was broken or twisted, before being taken to the police station. App., Vol. IV at 818.[12] His arms, shoulders, and back were visibly bruised and cut. *See* App., Vol. V at 1288; *see also* App., Vol. III at 637 (Officer Meyers testifying that he remembered Mr. McCoy "having some kind of marks"). Since his arrest, Mr. McCoy has experienced severe long-term pain in his back and neck. Dist. Ct. Doc. 15 at 10 (Mr. McCoy's sworn affidavit attached to the second amended complaint). Medical treatment, including pain medication and steroid injections, has not eliminated his pain and discomfort. *Id.*

---

precaution against Mr. McCoy's injuring himself or others when he regained consciousness. App., Vol. III at 627, 635-36. Officer Meyers testified that he began applying pressure because Mr. McCoy was "aggressive" when he woke up, "kicking his feet, slinging his head back, and being resistant, as in just throwing himself around." *Id.* at 633, 636. But Mr. McCoy testified that he "never resisted." App., Vol. II at 478. He also testified that, upon regaining consciousness, he tried to shield himself but "realized [he] was handcuffed and . . . zip tied, . . . said 'somebody help,' and then . . . felt [two] arm[s] reach around [his] neck." *Id.* at 472. We resolve this factual dispute in Mr. McCoy's favor.

[11] Mr. McCoy testified that he did not "recall how [he] got from out of the hotel room to the cop car" and that "[w]hen [he] came to [he] was standing in front of the cop car." App., Vol. II at 474.

[12] This fact is taken from the unsworn report of one of the other officers dispatched to the scene of Mr. McCoy's arrest. Mr. McCoy has no basis for disputing this fact, as he testified that he had no recollection of his treatment at the hospital. *See* App., Vol. V at 1287.

## B. *Procedural History*

Mr. McCoy sued the Appellees under 42 U.S.C. § 1983 in the U.S. District Court for the District of Kansas. He alleged that the Appellees violated his Fourth Amendment rights by using excessive force in effecting his arrest. After the parties completed discovery, the Appellees moved for summary judgment, asserting qualified immunity.

The district court granted summary judgment for the Appellees. It held that (1) Mr. McCoy had failed to show a Fourth Amendment violation, and (2) in any event, the law was not clearly established at the time of the Appellees' alleged violation. *McCoy v. Meyers*, 2017 WL 1036155, at *7, *8 (D. Kan. Mar. 16, 2017).

Mr. McCoy now appeals. His appeal concerns four alleged acts of excessive force: before he was handcuffed and zip-tied, (1) the Appellees' strikes and (2) Officer Pickering's carotid restraint; and after he was handcuffed and zip-tied, (3) the Appellees' strikes and (4) Officer Meyers's carotid restraint.[13]

## II. **DISCUSSION**

We begin with our standard of review and summary judgment standards. We also provide background on the qualified immunity defense and Fourth Amendment law

---

[13] We see no need for—nor have the Appellees sought—an individualized analysis of each Appellees' liability at this stage of the litigation. Even without record evidence of each officer's specific involvement, a reasonable jury could conclude that the Appellees each failed to intervene to prevent the allegedly excessive force. *See Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.").

pertaining to excessive force claims. Finally, we analyze whether the Appellees are entitled to qualified immunity, addressing the pre- and post-restraint force separately. We conclude that the Appellees are entitled to qualified immunity as to the former but not the latter.

### A. *Standard of Review*

"We review grants of summary judgment based on qualified immunity de novo." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014).

### B. *Summary Judgment Standards*

"[S]ummary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Patel v. Hall*, 849 F.3d 970, 978 (10th Cir. 2017) (quotations omitted); *see* Fed. R. Civ. P. 56(a). As noted above, "[a]ll disputed facts must be resolved in favor of the party resisting summary judgment." *White v. Gen. Motors Corp.*, 908 F.2d 669, 670 (10th Cir. 1990). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Patel*, 849 F.3d at 978 (quotations omitted). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Cardoso*, 490 F.3d at 1197 (quotations omitted).

12

## C. *Qualified Immunity Standards*

"[P]ublic officials enjoy qualified immunity in civil actions that are brought against them in their individual capacities and that arise out of the performance of their duties." *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013). They are entitled to qualified immunity "if their conduct does not violate clearly established statutory or constitutional rights." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan*, 134 S. Ct. at 1865. "The first asks whether the facts, 'taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right.'" *Id.* (brackets omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." *Id.* at 1866 (quotations omitted). "It is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016). Clearly established law "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotations omitted); *see also D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) ("The clearly established standard . . . requires a high degree of specificity." (quotations omitted)). "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White*, 137 S. Ct. at 552 (citations and quotations omitted); *see also Wesby*, 138 S. Ct. at 590 ("[T]here can be the

13

rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." (quotations omitted)).

"Courts have discretion to decide the order in which to engage the[] two [qualified immunity] prongs." *Tolan*, 134 S. Ct. at 1866 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866.

## D. *Fourth Amendment and Excessive Force*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV.  "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan*, 134 S. Ct. at 1865 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  Our discussion proceeds by (1) identifying the applicable unreasonableness test in the excessive force context, the *Graham* balancing test, and (2) providing an overview of relevant Tenth Circuit cases applying the *Graham* test.

### 1. *Graham* Reasonableness Balancing Test

In *Graham v. Connor*, the Supreme Court established a balancing test to determine when the use of force to effect a seizure is unreasonable.  *See* 490 U.S. at 396.  Under the *Graham* test, courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental

14

interests at stake." *Id.* (quotations omitted).  Relevant considerations include:  (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.  "[T]he 'reasonableness' inquiry . . . is an objective one:  the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.  In other words, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

2. **Tenth Circuit Cases Applying *Graham***

Our qualified immunity analysis relies heavily on three Tenth Circuit decisions published before the events at issue in this appeal:  *Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991); *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007); and *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008).  We summarize these cases, each of which involved excessive force allegations against law enforcement officers under § 1983.  In

15

each case, this court applied the *Graham* test and held that the plaintiff had shown sufficient facts to make out a Fourth Amendment violation.

    a.  Dixon v. Richer

In *Dixon*, the plaintiff alleged that the police officer defendants had used excessive force by kicking, beating, and choking him in the course of an investigative stop. 922 F.2d at 1458-59.[14] The defendants had stopped the plaintiff in his van to ask about another individual suspected of a misdemeanor. *Id.* at 1462. The plaintiff had been seen with the individual but was not himself suspected of any crime. *Id.* When stopped, the plaintiff initially submitted to a frisk by putting his hands up against his van. *Id.* at 1458. But when one of the defendants kicked him during the frisk, the plaintiff turned toward them and asked, "Is that f---ing necessary?" *Id.* The defendants called for backup and told the plaintiff to put his hands back up against the van. *Id.* The defendants began to pat the plaintiff down again and suddenly kicked him without warning. *Id.* The plaintiff began to fall, and the defendants then hit him in the stomach with a metal flashlight. *Id.* Once the plaintiff was on the ground, the defendants got on top of him and beat and choked him. *Id.* After another officer arrived on the scene, the defendants handcuffed the plaintiff. *Id.* at 1458-59.

Applying the *Graham* test to these facts, we held that the plaintiff had sufficiently shown a Fourth Amendment violation to survive summary judgment. *Id.* at 1463. In

---

[14] Our discussion of *Dixon* omits details that are not relevant for purposes of the present case. We do not differentiate the two defendants based on their individual conduct, nor do we discuss their conduct toward a second plaintiff.

16

doing so, we analyzed each alleged act of excessive force separately. *See id.* at 1462-63. Regarding the first kick, we determined—even though the plaintiff "w[as] not suspected of committing any crime" and "did not resist being frisked"—that the defendants acted reasonably "in an uncertain, and potentially dangerous circumstance." *Id.* at 1462. We deferred to the defendants' judgment that such force may have been necessary to effect the frisk. *Id.* But we determined that the defendants' continued use of force after the plaintiff "had already been frisked, had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats" was unreasonable. *Id.* at 1463. We reached this conclusion even though the plaintiff's "response to being kicked the first time (turning around and swearing at [the defendants]) could reasonably have been interpreted as an act of resistance." *Id.* at 1462.

b. Casey v. City of Federal Heights

In *Casey*, the plaintiff alleged that the police officer defendants had used excessive force by tackling, tasering, and beating him without warning in the course of arresting him for a misdemeanor. 509 F.3d at 1278.[15] The plaintiff had exited the municipal courthouse to retrieve money from his truck to pay a traffic citation fine. *Id.* at 1279-80. Unaware that removing a public record from the courthouse constituted a misdemeanor under state law, the plaintiff had left the building still holding his court file. *Id.* The defendants stopped the plaintiff without explanation as he was returning to the courthouse. *Id.* The plaintiff stated that he needed to get back to the courthouse to return

---

[15] Although we separately analyzed each defendant's conduct in *Casey*, we present the defendants' conduct as a whole for purposes of this discussion.

17

the file.  *Id.*  Without explaining that he was under arrest, the defendants tackled him to the ground.  *Id.*  They then tasered and handcuffed him and beat his head against the ground.  *Id.*

Applying the *Graham* test to these facts, we held that the plaintiff had sufficiently shown a Fourth Amendment violation to survive summary judgment.  *Id.* at 1283, 1286.  We determined that "all three [*Graham*] factors suggest[ed] that the officers used excessive force."  *Id.* at 1281.  First, we noted that the plaintiff "had committed a misdemeanor in a particularly harmless manner, which reduces the level of force that was reasonable for [the defendant] to use."  *Id.*  Second, we noted that the defendants had no reason to believe that the plaintiff posed an immediate threat to anyone's safety because he "was not violent during the encounter."  *Id.* at 1282.  Third, we noted that the plaintiff "was not attempting to flee . . . but rather return to the . . . courthouse," which "[i]f anything, . . . would have made himself easier to capture, not harder."  *Id.*

c.   Weigel v. Broad

In *Weigel*, Bruce Weigel's estate brought suit after Mr. Weigel died in an altercation with the highway patrol officer defendants.  544 F.3d at 1146-47.  The estate alleged that the defendants had used excessive force by putting pressure on Mr. Weigel's upper torso for several minutes.  *Id.* at 1152.  This occurred after Mr. Weigel had collided into the defendants' police car on the highway.  *Id.* at 1147.  The defendants suspected Mr. Weigel of driving while inebriated.  *Id.* at 1147-48.  He agreed to submit to a sobriety test but then walked out in front of oncoming traffic and continued crossing the highway even after getting struck by a passing van's sideview mirror.  *Id.* at 1148.  The defendants

18

followed, tackled him to the ground, and put him in a "choke hold." *Id.* During this struggle, Mr. Weigel fought back "vigorously, attempting repeatedly to take the [defendants'] weapons and evade handcuffing." *Id.* The defendants managed to handcuff Mr. Weigel, but he continued to struggle, so a bystander assisted by lying across the back of his legs. *Id.* The defendants then maintained Mr. Weigel in a facedown position and applied pressure to his upper torso. *Id.* Another bystander found plastic tubing or cord and bound Mr. Weigel's feet. *Id.* The defendants continued to apply pressure to Mr. Weigel's upper torso for several minutes until it was determined that Mr. Weigel had gone into cardiac arrest. *Id.* at 1149, 1152-53.

Applying the *Graham* test to these facts, we held that the plaintiff had sufficiently shown a Fourth Amendment violation to survive summary judgment. *Id.* at 1152-53. We determined that the defendants' use of force after—but not before—Mr. Weigel's hands and feet were bound was unreasonable. *See id.* (holding that the defendants' use of force, at least once Mr. Weigel "was handcuffed and his legs were bound," was unreasonable in part because they knew it "was unnecessary to restrain him"); *id.* at 1155 (Hartz, J., concurring) ("I do not think that the defendants violated Mr. Weigel's constitutional rights before his legs were bound[,] [i]n light of Mr. Weigel's strength and previous behavior."). We offered two reasons in support of our conclusion. First, the defendants' training materials would have put a reasonable officer on notice that "the pressure placed on Mr. Weigel's upper back as he lay on his stomach created a significant risk of asphyxiation and death." *Id.* at 1152. Second, any threat posed by Mr. Weigel had passed "once Mr. Weigel was handcuffed and his legs were bound," as evidenced by the

19

fact that one of the defendants then returned to the police vehicle and called the dispatcher reporting that Mr. Weigel was under control. *Id.* at 1152-53.

### C. *Qualified Immunity Analysis*

Mr. McCoy contends that the Appellees' use of force both before and after he was handcuffed and zip-tied violated clearly established Fourth Amendment law. We agree with him in part. Our qualified immunity discussion addresses Mr. McCoy's pre- and post-restraint excessive force claims separately. We conclude that (1) the pre-restraint force did not violate clearly established law, but (2) the post-restraint force violated Mr. McCoy's clearly established right to be free from the continued use of force after he was effectively subdued.

### 1. **Pre-Restraint Force**

The Appellees are entitled to qualified immunity as to Mr. McCoy's pre-restraint excessive force claims based on lack of clearly established law.

#### a. *Prong one—constitutional violation*

We skip prong one of the qualified immunity analysis because Mr. McCoy's failure to show clearly established law provides a sufficient basis to affirm. *See Tolan*, 134 S. Ct. at 1866 ("Courts have discretion to decide the order in which to engage the[] two [qualified immunity] prongs." (quoting *Pearson*, 555 U.S. at 236)).

#### b. *Prong two—clearly established law*

Mr. McCoy has failed to show clearly established law because (1) no reasonable jury could conclude that Mr. McCoy was effectively subdued in the pre-restraint period, and (2) preexisting precedent would not have made it clear to every reasonable officer

20

that using the force employed here on a potentially dangerous individual—who has not yet been effectively subdued—violates the Fourth Amendment. *See Perea*, 817 F.3d at 1204 ("It is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited.").

No reasonable jury could conclude that Mr. McCoy was effectively subdued when the allegedly excessive pre-restraint force occurred. Whether an individual has been subdued from the perspective of a reasonable officer depends on the officer having "enough time [] to recognize [that the individual no longer poses a threat] and react to the changed circumstances." *See Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (quotations omitted); *see also Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

Mr. McCoy concedes that a reasonable officer in the Appellees' position would be "entitled to believe [Mr. McCoy was] reaching for [Officer Burlie's] gun" when Officer Burlie pulled Mr. McCoy off the bed. Oral Argument at 7:08-7:16. According to Mr. McCoy's testimony, as soon as he hit the ground, Officer Pickering "immediately" placed him in a carotid restraint while, "simultaneously," unidentified officers hit him in the head, shoulders, back, and arms. App., Vol. II at 470, 480. Even if Mr. McCoy was, as he maintains, lying face down with his hands behind his back and with several officers pinning him, Aplt. Br. at 1, a reasonable officer in the Appellees' position could conclude that he was not subdued when the allegedly excessive force occurred.

21

Under these circumstances, the preexisting precedent would not have made it clear to every reasonable officer that striking Mr. McCoy and applying a carotid restraint on him violated his Fourth Amendment rights. The cases cited by Mr. McCoy—*Dixon*, *Casey*, and *Weigel*—involved force used on individuals who either did not pose a threat to begin with or were subdued and thus no longer posed any threat. *See Weigel*, 544 F.3d at 1152 (holding that the defendants' alleged use of force became excessive "once Mr. Weigel was handcuffed and his legs were bound"); *Casey*, 509 F.3d at 1282 (holding that the defendants' alleged use of force was excessive where the plaintiff was "suspected of innocuously committing a misdemeanor" and "was neither violent nor attempting to flee"); *Dixon*, 922 F.2d at 1463 (holding that the defendants' alleged use of force became excessive after the plaintiff "had already been frisked, had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats").[16]

---

[16] Mr. McCoy also cites two unpublished decisions for clearly established law: *Herrera v. Bernalillo Cty. Bd. of Cty. Comm'rs*, 361 F. App'x 924 (10th Cir. 2010) (unpublished), and *Gouskos v. Griffith*, 122 F. App'x 965 (10th Cir. 2005) (unpublished). Although an unpublished decision "need not be ignored in determining whether the law was clearly established," *Estate of Booker*, 745 F.3d at 428 n.29, *Herrera* and *Gouskos* do not help Mr. McCoy because, like our published cases, they involve the use of force on plaintiffs who never posed a threat or were already subdued. *See Herrera*, 122 F. App'x at 928 (affirming denial of summary judgment where the record supported a finding that the defendants gang-tackled the plaintiff—who was suspected of a misdemeanor—even though he "neither evaded the [defendants] nor resisted their efforts to arrest him" and "promptly complied" with commands to "l[ie] face down on the ground with his arms and hands visibly extended"); *Gouskos*, 122 F. App'x at 977 (citing *Dixon* in concluding that the factual issue whether the defendant "continued to choke [the plaintiff] and stomped on his back after he had been subdued and handcuffed" precluded summary judgment for the defendant).

Based on the foregoing, Mr. McCoy has failed to show clearly established law prohibiting the Appellees' pre-restraint use of force. The Appellees are therefore entitled to qualified immunity as to Mr. McCoy's claims based on this conduct.

## 2. **Post-Restraint Force**

The Appellees are not entitled to qualified immunity as to Mr. McCoy's post-restraint excessive force claims because the post-restraint force violated Mr. McCoy's clearly established right to be free from the continued use of force after he was effectively subdued. We address both steps of the qualified immunity analysis.

### a. *Prong one—constitutional violation*

Viewing the evidence in the light most favorable to Mr. McCoy, a reasonable jury could conclude that the post-restraint force violated his Fourth Amendment rights. Although the first *Graham* factor weighs in favor of the Appellees, the second and third *Graham* factors strongly favor Mr. McCoy. Accordingly, Mr. McCoy has met his burden of showing a constitutional violation at this stage of the case.

#### i. First *Graham* factor—severity of the crime

The first *Graham* factor—the severity of the suspected crime—weighs against Mr. McCoy. Mr. McCoy does not dispute that the Appellees were advised before entering his motel room that he was armed and that he had two hostages. Moreover, Mr. McCoy concedes that the Appellees reasonably suspected him of pointing a gun at several officers and reaching for Officer Burlie's gun leading up to the allegedly excessive force. *See* Oral Argument at 7:08-7:16, 14:18-14:30. Under these circumstances, the severity of

23

Mr. McCoy's suspected crimes weighs against finding that the post-restraint force was unreasonable.[17]

ii. Second *Graham* factor—immediate threat posed

In contrast, the second *Graham* factor—the immediate threat posed by the suspect—favors Mr. McCoy. Viewing the evidence in the light most favorable to Mr. McCoy, the post-restraint force occurred after Mr. McCoy was rendered unconscious, handcuffed, and zip-tied. *See* App., Vol. II at 471-72. The Appellees nevertheless contend that "during the approximately forty seconds when the alleged excessive force occurred, [they] simply had no opportunity to stop and evaluate whether [Mr. McCoy] had stopped or would stop acting aggressively." Aplee. Br. at 32.

But the evidence here is sufficient for a reasonable jury to draw a contrary inference. It allows a finding that Mr. McCoy was unconscious long enough to be handcuffed, zip-tied, and moved from a prone, face-down position into a sitting position, and that the Appellees nevertheless struck him over 10 times and placed him into a second carotid restraint upon reviving him.[18] A reasonable jury could conclude based on

---

[17] Mr. McCoy contends that the first *Graham* factor favors him and that the district court "erred in failing to consider that any crimes [he] committed *were necessarily complete*" by the time the Appellees allegedly used excessive force. Aplt. Br. at 19. But we have previously considered completed crimes in weighing the first *Graham* factor. *See, e.g.*, *Casey*, 509 F.3d at 1280 (weighing crime of leaving the courthouse with court files as a factor in the *Graham* analysis even though it was complete when the excessive force began); *Perea*, 817 F.3d at 1203 (weighing crime of pedaling through a stop sign as a factor in the *Graham* analysis even though it was complete when the excessive force began).

[18] *See* App., Vol. II at 471-72 (Mr. McCoy testifying that when he regained consciousness from Officer Pickering's carotid restraint, he "was in a sitting position

this record that the Appellees should have been able "to recognize and react to the changed circumstances." *See Fancher*, 723 F.3d at 1201 (quotations omitted).[19] At this stage of the case, we "may not resolve [this] genuine dispute[] of fact in favor of the [the Appellees]." *Tolan*, 134 S. Ct. at 1866. The lack of immediate threat posed by Mr. McCoy weighs in favor of finding that the post-restraint force was unreasonable.

### iii. Third *Graham* factor—active resistance or attempts to flee

Finally, the third *Graham* factor—the suspect's active resistance (or attempts to flee)—also favors Mr. McCoy. Our cases have consistently concluded that a suspect's initial resistance does not justify the continuation of force once the resistance ceases. *See Perea*, 817 F.3d at 1203 ("Although use of some force against a resisting arrestee may be justified, continued and increased use of force against a subdued detainee is not."); *see*

---

with [his] legs zip tied and [his] hands handcuffed behind [his] back" and felt over 10 strikes to his head and body, yelled out for help, and then was "choked" unconscious again); App., Vol. III at 595 (Officer Pickering testifying that at one point, "Mr. McCoy [was] unconscious . . . [a]nd handcuffed . . . [w]ith zip ties around his ankles"); App., Vol. V at 1314 (Officer Burlie affirming at his deposition that when Mr. McCoy "eventually [came] to," he was handcuffed and his legs were restrained); *see also* App., Vol. II at 427-28 (the Appellees alleging that Officer Meyers entered the motel room while Mr. McCoy was unconscious from Officer Pickering's carotid restraint and that Officer Meyers moved Mr. McCoy into a sitting position before bringing him back to consciousness).

[19] The district court reached the opposite conclusion, stating that any force "plaintiff may have felt w[as] part of defendants [sic] attempt to subdue a subject who, *just minutes or even seconds before*, had been threatening officers . . . with a gun." *McCoy*, 2017 WL 1036155, at *7 (emphasis added). But the relevant inquiry is not how much time elapsed but whether that amount of time provided a meaningful opportunity for a reasonable officer to recognize and react to changed circumstances. *See Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified *even seconds later* if the justification for the initial force has been eliminated." (emphasis added)).

25

*also Weigel*, 544 F.3d at 1152-53 (a reasonable jury could find that the alleged force was excessive once the plaintiff's hands and feet were bound, even though the plaintiff had previously put up significant resistance); *Dixon*, 922 F.2d at 1462-63 (a reasonable jury could find that the alleged force was excessive once the plaintiff had been frisked, had his hands against a vehicle, and was no longer making aggressive moves, even though the defendants could reasonably have perceived the plaintiff's previous actions as resistance); *Herrera v. Bernalillo Cty. Bd. of Cty. Comm'rs*, 361 F. App'x 924, 928 (10th Cir. 2010) (unpublished) (a reasonable jury could find that the alleged force was excessive where the defendants "acknowledge[d] that, whatever apprehensions of possible flight might have existed when they first saw [the plaintiff], by the time [of the alleged force] further flight was no more than 'certainly possible' and was 'perhaps unlikely'" (citation omitted)).

In our case, viewing the evidence in the light most favorable to Mr. McCoy, any resistance on his part had fully ceased by the time of the post-restraint force. Even if the Appellees previously perceived that Mr. McCoy pointed a gun at them and reached for Officer Burlie's duty weapon, Mr. McCoy had been rendered unconscious, handcuffed, and zip-tied before he was revived. *See* App., Vol. II at 471-72. And as he regained consciousness, even though he did not resist, the Appellees struck him more than 10 times and placed him in a carotid restraint with enough pressure to render him unconscious again. *See* App., Vol. II at 471-72, 478.[20] The cessation of active resistance

---

[20] Officer Meyers testified that he had applied the second carotid restraint in part to ensure Mr. McCoy's own safety. App., Vol. III at 635 ("So [Mr. McCoy]'s placed in

on Mr. McCoy's part weighs in favor of finding that the post-restraint force was unreasonable.

\* \* \* \*

Although the *Graham* factors point in both directions, Mr. McCoy has shown sufficient facts at this stage to make out a Fourth Amendment violation based on the Appellees' post-restraint use of force. The Appellees faced a potentially dangerous situation before they subdued Mr. McCoy, whom they suspected of serious crimes and had perceived to be pointing a gun in their direction and reaching for Officer Burlie's handgun. But when the relevant conduct occurred, Mr. McCoy had already been rendered unconscious, handcuffed, and zip-tied, and—although he was regaining consciousness—was no longer resisting. The Appellees also had sufficient time to recognize the change in circumstances and the diminished need for force after Mr. McCoy was subdued. The previously dangerous situation faced by the Appellees therefore does not justify their post-restraint use of force. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666 (10th Cir. 2010) (concluding that while "our role is not to second guess on-the-ground decisions with the benefit of 20/20 hindsight[,] . . . [i]t is not objectively reasonable to ignore specific facts as they develop (which contradict the need

_____

[the restraint] for his protection and for other officers' protection, so he does not hurt himself. Because when he wakes up, he could be volatile and slinging his body."). But "the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (quotations omitted). Officer Meyers's subjective intentions thus do not factor into our objective reasonableness analysis.

27

for [a particular] amount of force), in favor of prior general information about a suspect").

      b.  *Prong two—clearly established law*

Viewing the evidence in the light most favorable to Mr. McCoy, preexisting Tenth Circuit precedent—*Dixon*, *Casey*, and *Weigel*—made it clear to any reasonable officer in the Appellees' position that the post-restraint force was unconstitutional. *See Perea*, 817 F.3d at 1204 ("It is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited."). Although *Dixon*, *Casey*, and *Weigel* are not factually identical to this case, they nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment. In light of those cases, it should have been obvious to the Appellees that continuing to use force on Mr. McCoy after he was rendered unconscious, handcuffed, and zip-tied was excessive.

*Dixon*, *Casey*, and *Weigel* clearly establish that the Fourth Amendment prohibits the use of force without legitimate justification, as when a subject poses no threat or has been subdued. *See Casey*, 509 F.3d at 1286 ("[A]n officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was a legitimate justification for acting as she did." (quotations omitted)); *see also Weigel*, 544 F.3d at 1152 (the justification for using force ceased "once Mr. Weigel was handcuffed and his legs were bound"); *Dixon*, 922 F.2d at 1463 (the justification for using force ceased once the plaintiff "had already been frisked, had his hands up against the van with his back to the

28

officers, and was not making any aggressive moves or threats"). In light of these cases, every reasonable official in the Appellees' position should have known that repeatedly striking a suspect—who is handcuffed, zip-tied, and just regaining consciousness—and subjecting him to a carotid restraint is unconstitutional.

Although *Dixon*, *Casey*, and *Weigel* are not factually identical to this case, they are factually analogous and their differences do not defeat Mr. McCoy's clearly established law showing.[21] The cases all share the decisive factual circumstance that the defendants used excessive force on the plaintiff when he was already subdued. Even assuming that our previous cases were not sufficiently particularized to satisfy the ordinary clearly established law standard, ours is "the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quotations omitted); *see also White*, 137 S. Ct. at 552 ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness

_____

[21] As discussed above, *Dixon* and *Casey* involved beating, choking, and tasering plaintiffs who were not suspected of serious crimes, posed little to no threat, and put up little to no resistance. *See Casey*, 509 F.3d at 1282; *Dixon*, 922 F.2d at 1462-63. Here, although the Appellees used similar kinds of force—beating and carotid restraints—Mr. McCoy was suspected of more serious crimes—holding two people hostage and assaulting police officers by pointing a gun at them and reaching for one of their duty weapons.

The *Weigel* defendants faced a more dangerous situation than the *Dixon* and *Casey* defendants did. *See Weigel*, 544 F.3d at 1148 (although Mr. Weigel was initially suspected only of driving under the influence, he later "fought vigorously, attempting repeatedly to take the [defendants'] weapons"). But the Appellees here used a lesser degree of force than in *Weigel*, in which the defendants put pressure on the suspect's back for several minutes despite being on notice that such pressure "created a significant risk of asphyxiation and death." *Id.* at 1152.

29

must be apparent." (citations and quotations omitted)).[22]  And in light of *Dixon*, *Casey*,

and *Weigel*, the violation in this case is not necessarily "rare" but is "apparent."[23]

Finally, this court's later decisions, though not controlling, accord with our clearly

established law determination here.[24]  In *Perea*, for example, we relied primarily on

*Dixon* in holding that it was "clearly established [on March 21, 2011] that officers may

---

[22] In *Casey*, this court adopted a "sliding scale" approach to clearly established law in the excessive force context.  509 F.3d at 1284 ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." (quotations omitted)).  We have since stated that "our sliding-scale approach may arguably conflict with recent Supreme Court precedent on qualified immunity."  *Lowe v. Raemisch*, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017).  We do not rely on the sliding scale here and thus need not decide its validity.  And nothing in recent Supreme Court precedent questions our merits holding in *Casey*, which—along with *Dixon* and *Weigel*—should have put the Appellees on notice that the post-restraint force was excessive.

[23] The Supreme Court recently reversed the denial of qualified immunity in an excessive force case involving a police officer shooting someone who was wielding a knife.  *Kisela v. Hughes*, No. 17-467 (U.S. Apr. 2, 2018) (per curiam).  *Kisela* is distinguishable from this case because it did not concern the use of force on a subdued individual.  *See id.* (slip. op., at 6-8).

[24] The dispositive clearly established law inquiry is whether the *preexisting* law gave adequate notice that the complained of conduct was unconstitutional.  *White*, 137 S. Ct. at 552.  And we rely only on our cases decided before the March 22, 2011 incident in this case for our clearly established law determination.  In *Kisela*, the Supreme Court emphasized that "a reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious."  No. 17-467 (slip. op., at 7).  Here, as explained above, the preexisting cases not only gave fair notice to the Appellees, but the Fourth Amendment's requirements were also obvious.  In citing this court's later decisions, we do not suggest that a reasonable officer would not have known the conduct here was unconstitutional without their benefit.  Rather, we merely note that our clearly established law analysis here is in line with circuit precedent which (1) involves similar conduct (use of force on subdued suspects), that (2) occurred in the same relevant period (on or before March 22, 2011), and (3) relies on the same cases (*Dixon*, *Casey*, *Weigel*) for clearly established law.

not continue to use force against a suspect who is effectively subdued." *See* 817 F.3d at 1201, 1204-05. Likewise, in *Estate of Booker*, we relied on *Weigel*, *Casey*, and out-of-circuit cases in holding that it was clearly established on July 8, 2010 that officers may not use force—namely, pressure on back, tasering, and neck restraint—"on a person who is not resisting and who is restrained in handcuffs." *See* 745 F.3d at 412, 428-29.[25]

* * * *

In sum, qualified immunity applies (1) to Mr. McCoy's claims based on the pre-restraint force, due to the lack of clearly established law, but (2) not to the claims based the post-restraint force, which violated Mr. McCoy's clearly established right to be free from continued force after he was effectively subdued.

## III. CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the district court's grant of summary judgment on qualified immunity grounds and remand for further proceedings consistent with this opinion.

---

[25] Although *Estate of Booker* concerned force used on a detainee and thus implicated the Fourteenth Amendment, we stated that "a finding of excessive force under the Fourth Amendment is highly relevant to the relationship between the amount of force used and the need presented in the first part of an excessive force inquiry under the Fourteenth Amendment." 745 F.3d at 424 n.26 (quotations omitted).